**In the Matter of BONANZA IMPORT & EXPORT, INC., et al., Debtors.**

**STANDARD CHARTERED BANK, PLC, Plaintiff,**

**v.**

**Julio KLEPACH and Esther Klepach, Defendants.**

**Bankruptcy No. 83–01089–BKC–JAG. Adv. No. 83–0909–BKC–JAG–A.**

United States Bankruptcy Court, S.D. Florida.

Oct. 3, 1984.

See also, Bkrtcy., 43 B.R. 577.

Roy M. Hartman, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for Chase Bank Intern.

Andrew J. Nierenberg, Britton, Cohen, Cassel, Kaufman & Schantz, P.A., Miami, Fla., for Klepach.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOSEPH A. GASSEN, Bankruptcy Judge.

This adversary proceeding commenced with the filing of a complaint by Standard Chartered Bank, PLC (Standard) seeking to determine the dischargeability of a corporate debt personally guaranteed by Julio Klepach and his wife Esther Klepach, the defendants. The Court, having heard the testimony at the trial held on January 18, 1984 and March 16 and 19–22, 1984 and examined the evidence presented; observed the candor and demeanor of the witnesses;

considered the arguments of counsel and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

In May 1978, Standard extended Bonanza Import & Export, Inc. (Bonanza) a revolving line of credit that varied from a minimum of $150,000 to a maximum of $600,000 which enabled Bonanza to open letters of credit to finance its international trade transactions. Julio Klepach, President of Bonanza, and Esther Klepach, an officer of Bonanza, who were both also the sole shareholders, personally guaranteed Bonanza's payment obligations under this revolving line. At the time of trial, defendants personally guaranteed $219,676.68, plus interest as of October 3, 1984 of $56,026.97, of the corporate indebtedness.

Standard's world-wide practice, where permitted under the laws of the country of the proposed corporate borrower and guarantor, was to require personal guarantees from the shareholders of small, closely held corporate borrowers and to require that the guarantor submit a personal financial statement before any credit is extended to the corporate borrower. Prior to extending any credit to any small, closely held corporate borrower, it was Standard's policy to review the guarantor's personal financial statements to ascertain if he had sufficient net worth to guarantee repayment of the corporate credit obligation, if necessary. If after reviewing the guarantor's personal financial statement, Standard felt that sufficient net worth was not present to repay the corporate indebtedness, if called upon to do so, credit would not be extended to the corporate borrower in the absence of additional security. Accordingly, before Standard extended any credit to Bonanza, it required personal guarantees from the defendants as well as their personal financial statements.

From approximately May 1978 through March 1982, defendants submitted four financial statements to Standard, each of which was prepared at Julio Klepach's direction. Julio Klepach certified that all the information contained therein was true and correct and testified he carefully reviewed the information contained in each financial statement prior to submitting each to Standard. He admitted that he intended each financial statement to reflect the personal condition of both him and his wife. Julio Klepach also testified that he intended that Standard rely upon the information contained in each of these financial statements in extending credit to Bonanza.

■ While each financial statement was signed only by Julio Klepach, the Court finds that Esther Klepach is also bound by the information contained in each statement. Esther Klepach executed a guarantee of payment which she knew was a predicate for the credit line to Bonanza and thus was on notice that she was obligated to personally repay Bonanza's indebtedness. Further, Esther Klepach conceded that she gave her husband total discretion to handle all their corporate and personal financial affairs. There was no evidence nor argument presented that Esther Klepach did not intend her husband to sign each financial statement on her behalf, that Julio Klepach was not authorized to sign each statement on her behalf nor that she did not intend that the bank rely on the joint financial statements. Esther Klepach's silence or acquiesence in her husband's actions supports a finding that she ratified the submission of the financial statements to Standard.

Prior to extending any credit to Bonanza and during each subsequent year, Standard received at least one personal financial statement from the defendants reflecting their joint net worth. Standard requested updated information regarding the personal financial condition of defendants each and every year in which the line of credit was in existence to ensure that they were financially able to repay Bonanza's indebtedness, if necessary.

Standard's primary focus during this trial was on the values defendants ascribed to their real property holdings. On September 18, 1979, defendants purchased property located at 1600 N.E. 2nd Avenue property for $350,000. On October 27, 1982, de-

fendants sold the 1600 N.E. 2nd Avenue property for $330,000 to Jura Trade Corporation (Jura), a Panamanian corporation in which the defendants owned a 100% beneficial interest. On the three personal financial statements defendants submitted between January 31, 1980 and October 31, 1981, they ascribed three separate values to this property, i.e. $700,000, $1,000,000 and $3,500,000. The only credible evidence presented regarding the market value of the 1600 N.E. 2nd Avenue property was that it never exceeded $400,000.

While defendants attempted to justify the valuations placed on this property by introducing evidence of Julio Klepach's plan to develop a duty free store complex on the property, this proposed development never went beyond the formulative stage. Julio Klepach conceded he failed to obtain investors and financing for the project he envisioned. Further, he conceded that he never hired a contractor to build a duty free complex and that ground was never broken. In fact, formal plans for this project were not prepared until February 23, 1983, almost one year after defendants submitted the last personal financial statement to Standard. The Court finds that the 1600 N.E. 2nd Avenue property did not, and could not, increase in value simply due to Julio Klepach's future plans for the property.

The Klepachs' personal financial statements valued their residence as follows:

| | |
|---|---|
| February 21, 1979 | $250,000 |
| January 31, 1980 | $360,000 |
| October 31, 1980 | $400,000 |
| October 31, 1981 | $750,000 |

Defendants failed to present any credible evidence to support these values.

This Court also takes note of the fact that in September 1983 defendants claimed on their bankruptcy schedules that their residence was worth $350,000. Julio Klepach's contention that he only set forth his equity interest in the residence on his bankruptcy schedules is unsupportable. First, the bankruptcy schedules require a debtor to list the market value of his property. Second, even if this Court accepts this explanation for the discrepancy in the values, then the $676,000 value ascribed by Mr. Klepach to the residence on the schedules ($350,000 plus mortgages of $326,000) still does not adequately explain the $750,000 value. Although the Klepachs' homestead is exempt, the valuations defendants placed on their residence are indicative of a scheme to induce Standard to extend credit to Bonanza.

Defendants purchased their 3253 S.W. 22nd Avenue property for $37,000 in January 1981; yet, valued the property at $100,000 on their October 31, 1980 (executed on March 19, 1981) and October 31, 1981 financial statements. On November 15, 1982, defendants sold this property for $60,000. Thus, defendants almost tripled the value of this property.

Defendants' valuation of their Fort Myers property is further evidence of their intent to deceive. Julio Klepach claimed that he paid $25,000 in principal and interest for the property over a period of twelve years ending in 1960 and thus ascribed a $25,000 value to it. Given Julio Klepach's business acumen, he was certainly well aware that this was not a proper measure of market value. The extent of his deception is further evidenced by the fact that the tax assessed value of this property never exceeded $3,740, that the defendants' bankruptcy schedules state the property is only worth $10,000, and that Julio Klepach readily admitted he has not even been to Fort Myers for over fifteen years.

Despite a specific provision in the financial statements, defendants also failed to disclose that Abraham Klepach, Julio Klepach's brother, owned an interest in certain Orlando properties reflected on the financial statements. Nonetheless, Julio Klepach claimed that he only set forth the value of his undivided one-half interest in the Orlando properties. He further claimed that this value was derived from an estate tax return; yet, defendants failed to introduce the tax return into evidence and failed to offer any explanation for the failure to do so. In addition, defendants

failed to call Abraham Klepach as a witness to corroborate any of Julio Klepach's testimony.[1]

The value defendants ascribed to Julio Klepach's one-half interest in the 5511 East Colonial property in Orlando ranged from $70,000 as of February 21, 1979 to $100,000 as of October 31, 1981. If this was true, then the entire parcel would have been worth $140,000 to $200,000. However, in April 1983, the undivided one-half interest Julio Klepach held in the 5511 East Colonial property, as well as his undivided one-half interest in one *other* parcel that he jointly owned with his brother in Orlando, were sold for a *total* sum of $35,000 to Jura, the Panamanian corporation in which the defendants owned a 100% beneficial interest.

■ Based on this evidence, the Court finds the defendants' personal financial statements submitted to Standard were each materially false in that the values of their real estate holdings described above were artificially inflated. Approximately 90 per cent of the defendants' stated net worth was comprised of their various real estate holdings. As the major component of their net worth, Standard placed particular emphasis on the values defendants ascribed to their real estate in assessing their ability to repay Bonanza's debt. The Court finds that the Klepachs materially inflated the true value of their real estate in order to induce Standard to extend credit to Bonanza. This Court might have come to a different conclusion regarding the materiality of defendants' inflated valuation or defendants' intent except for the 1600 N.E. 2nd Avenue property. However, the cumulative effect of the numerous overvaluations convinces the Court that defendants intended to inflate the value of their real estate holdings and consequently deceived Standard as to the true value of their real estate and thus, their true net worth.

In extending credit to Bonanza, Standard reasonably relied upon the perceived accuracy of defendants' financial statements.

The lines of credit Standard extended to Bonanza were only for a duration of one year and expired after that period of time. Any new facility that Standard extended was reviewed anew in light of the updated personal financial statements as well as individual and corporate credit references, account history and corporate financial statements. Defendants' personal guarantees were a factor in the decision by Standard's Miami branch in recommending that credit be initially extended to Bonanza and thereafter renewed each year. In each recommendation Standard's Miami branch made regarding the propriety of extending credit to Bonanza, Standard relied on defendants' personal guarantees as security for each new credit facility. Each recommendation also favorably commented upon Julio Klepach's personal integrity.

Standard's reliance upon the defendants' personal financial statements is further indicated by events in March 1982. The line of credit which Standard granted to Bonanza was slated to expire on March 31, 1982. Prior to the expiration date, Standard's Miami branch, in accordance with then existing policy and practice, requested defendants' updated personal financial statement so that a review of the facility could be conducted. On March 3, 1982, Mr. Terdre, then Standard's Miami branch manager, sent a letter to Julio Klepach requesting that he provide Standard with an updated personal financial statement of him and his wife together with an October 31, 1981 corporate financial statement. When Standard did not receive a reply to its March 3, 1982 letter, Mr. Terdre telephoned Julio Klepach on March 15, 1982 requesting the financial statement which he followed up by a letter dated the same day. Although Julio Klepach submitted the Klepachs' October 31, 1981 personal financial statement on March 18, 1982, the $400,000 credit facility was permitted to expire on March 31, 1982.

Upon receipt of the October 31, 1981 personal financial statement, Standard's

---

1. Thus, this Court concludes that his testimony would not have supported defendants' conten-

tions. *See In re Rickey,* 8 B.R. 860, 863 (Bkrtcy. M.D.Fla.1981) and cases cited therein.

Miami branch reviewed defendants' then existing personal financial condition and found their stated net worth of $4,787,297 to be sufficient to warrant a recommendation that credit be extended. After reviewing the October 31, 1981 personal financial statement, Mr. Terdre questioned Mr. Klepach with respect to the increase in the stated value of the 1600 N.E. 2nd Avenue property from $1,000,000, as of October 31, 1980, to $3,500,000. Mr. Klepach responded stating that his property was located in the area slated for downtown redevelopment, which explanation Standard found satisfactory. On April 21, 1982, Standard's Miami branch recommended that the $400,000 line of credit be renewed, which recommendation was based, in part, on the defendants' stated financial condition. The recommendation was subsequently approved and credit was thereafter extended to Bonanza up to an aggregate amount of $400,000.

Standard challenges the discharge of the debt on the basis of 11 U.S.C. Section 523(a)(2)(B) which excepts from discharge:

any debt—(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ....

█ The value ascribed by the defendants as to real property interests in their residence and the 1600 N.E. 2nd Avenue, 3253 S.W. 22nd Terrace, Fort Myers and 5511 East Colonial properties, as well as the failure to state the ownership interest of Julio Klepach's brother in the Orlando properties, rendered all their personal financial statements materially false within the meaning of 11 U.S.C. Section 523(a)(2)(B)(i). An actually false or untrue statement of a substantial nature pertaining to assets or liabilities of a debtor will satisfy the materiality requirement under Section 523(a)(2)(B). *See, e.g., In re Drewett,* 13 B.R. 877, 879 n. 5 (Bkrtcy.E.D.Pa. 1981); *In re Magnusson,* 14 B.R. 662, 668 (Bkrtcy.N.D.N.Y.1981); *In re Crockett,* 11 B.R. 822, 827 (Bkrtcy.E.D.Va.1981) (magnitude of the discrepancies between the actual and represented values of income, liabilities and assets in the financial statement make such statements materially false). "A correct statement of one's assets has an equally material bearing on the financial condition of the borrower [or guarantor] and a substantial overstatement of one's assets likewise renders the statement materially false." *In re Clark,* 1 B.R. 614, 617 (Bkrtcy.M.D.Fla.1979).

Not only did the defendants affirmatively misrepresent the fair market value of their real property but they also misled Standard with respect to the extent of their ownership interests in their Orlando properties. Julio Klepach failed to offer an explanation for his failure to disclose the existence of his brother's half interest in the Orlando properties. His failure to disclose his brother's ownership interest is a material omission. *See, e.g., In re Rickey,* 8 B.R. 860, 862 (Bkrtcy.M.D.Fla.1981); *In re Pappas,* 23 B.R. 715, 719 (Bkrtcy.D.Kan. 1982); *In re Tomei,* 24 B.R. 204, 9 B.C.D. 1166, 1167, (W.D.N.Y.1982).

█ While bankruptcy is intended to give a debtor a fresh start, the policy of liberality of interpretation of exceptions to dischargeability in favor of the debtor is not meant to protect the dishonest debtor. *See, e.g., Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). Proof of an intent to deceive a creditor on a debtor's part need not be established by direct proof but may be inferred from the surrounding circumstances. The court in *In re Rickey,* 8 B.R. 860, 863 (Bkrtcy.M.D.Fla.1981) stated:

it is sufficient to show that a false representation on a financial statement was made with actual knowledge that it was incorrect or it was made with reckless indifference and disregard of the actual

facts and without examining the available sources which were readily available and the statement was made without reasonable grounds to believe that the statement was, in fact, correct. *Morimura, Arai & Co. v. Taback*, 279 U.S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586 (1929). *See also In re Coughlin*, 27 B.R. 632, 10 B.C.D. 266, 268 (Bkrtcy.D.Mass.1983) ("Intent to deceive is present when the debtor has 'seen the financial statement and the errors were such that he knew or should have known their falsity'"); *In re Barrett*, 2 B.R. 296, 301 (Bkrtcy.E.D.Pa.1980) (Courts will not shield an intelligent, educated businessman, who had ample opportunity to read what he signed, from his own carelessness, especially in light of his extensive dealings with banks). Debtors are presumed to intend the natural consequences of their acts and thus, a debtor who makes a knowing misrepresentation is presumed to have an intent to deceive. *In re Coughlin, supra*, 27 B.R. 632, 10 B.C.D. at 268; *In re Clark*, 1 B.R. 614, 617 (Bkrtcy.M.D.Fla.1979).

Applying these principles to the facts in the instant case, it is apparent that defendants knowingly and intentionally overstated the value of their real property. The sheer magnitude of defendants' overstatements evidences an intent to deceive. *See, e.g., In re Rosenthal*, 29 B.R. 495, 496–97 (Bkrtcy.S.D.Fla.1983). Defendants obviously intended to create a false impression as to their joint financial condition and thus, they acted with the requisite intent to deceive. *See, e.g., In re Shipley*, 1 B.R. 85 (Bkrtcy.D.Md.1979). As discussed above, the mere fact that Esther Klepach relied upon her husband does not negate a finding that she also intentionally deceived the plaintiff banks. *See In re Diaz de Villegas*, 26 B.R. 600, 601–02 (Bkrtcy.S.D.Fla.1983).

Finally, Standard reasonably relied on defendants' personal financial statements in extending or otherwise renewing various lines of credit to Bonanza, a corporation in which defendants were the sole shareholders. Prior to extending any credit to Bonanza, Standard requested defendants to personally guarantee repayment of any credit facility and insisted upon receiving defendants' personal financial statements. Each financial statement it received was reviewed and analyzed to ascertain if defendants possessed the financial ability to repay Bonanza's debt, if necessary. The reasonableness of Standard's reliance on defendants' financial statements is further demonstrated by the fact that in March 1982 Standard insisted that defendants submit an updated financial statement before it would renew the credit facility. Only after the financial statement was analyzed did Standard's Miami office recommend it be renewed. It is well established that Standard's partial reliance is sufficient to preclude a discharge under 11 U.S.C. Section 523(a)(2)(B). *See, e.g., In re Barrett*, 2 B.R. 296, 302 (Bkrtcy.E.D.Pa. 1980); *In re Goff*, 17 B.R. 564, 567 (Bkrtcy. W.D.Ky.1982) (reliance must have been a contributing cause for extension of credit); *In re Coughlin*, 27 B.R. 632, 10 B.C.D. 266, 269 (Bkrtcy.D.Mass.1983) (creditor need not show it was motivated solely by the false financial information); *In re Tomei*, 24 B.R. 204, 9 B.C.D. 1166, 1167 (W.D.N.Y. 1982) (false financial statement was a substantial factor in extending the credit in question); *In re Clark*, 1 B.R. 614, 617 (Bkrtcy.M.D.Fla.1979); *In re Magnusson*, 14 B.R. 662, 668 (Bkrtcy.N.D.N.Y.1981); *In re Ebbin*, 32 B.R. 936 (Bkrtcy.S.D.N.Y. 1983) (only partial reliance need be shown).

Accordingly, the Court finds the debt guaranteed by defendants is nondischargeable since all the required elements of Section 523(a)(2)(B) have been proved by clear and convincing evidence. Defendants owe Standard $219,676.68 as principal, plus $56,026.97 as interest as of October 3, 1984, for a total sum of $275,703.65. Pursuant to Bankruptcy Rule 9021(a), a Final Judgment will be entered in accordance with these findings of fact and conclusions of law.