**In re Richard MONAHAN and Corinne Monahan, Debtors.**

**Lillian E. WEEDEN, Plaintiff,**

**v.**

**Richard MONAHAN and Corinne Monahan, Defendants.**

**Bankruptcy No. 89–10246.**
**Adv. No. 89–1049.**

United States Bankruptcy Court,
D. Rhode Island.

March 20, 1991.

Andrew Richardson, Boyajian, Harrington & Richardson, Providence, R.I., for debtors, defendants.

Barbara A. Fontaine, Wakefield, R.I., for plaintiff.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on August 22, 23, October 22, and November 27, 1990, on the complaint of Lillian Weeden, to have a debt of the debtors/defendants, Richard and Corinne Monahan, declared nondischargeable pursuant to 11 U.S.C.A. § 523(a)(2)(A).

## FACTS

This dispute arises out of a contract, dated July 8, 1988, for the purchase and erection of a modular home for the plaintiff Weeden by defendants' corporation, Towne & Country Homes, Inc. Under the con-tract, Towne & Country was to procure a modular home from the manufacturer, Excel Homes, and assemble the building, together with all necessary excavation, foundation, concrete, heating, plumbing, and electrical work, on Weeden's lot. The payment schedule called for an initial deposit of $33,928 to be delivered upon the signing of the contract; another $31,600 due "when house is set and exterior is complete"; and a final payment of $7,900 "when all utilities, landscaping, driveway complete," for a total contract price of $73,428.

On July 11, 1988, Weeden paid the deposit (approximately one half from her savings, and one half from the release of funds from her construction loan) to Towne & Country, in the amount of $33,928, on the representation by the Monahans that the large deposit was necessary to obtain the house package from Excel, and to prepare the foundation and slab to receive the building.[1] Thereafter, some excavation and foundation work was done, but the "knee-wall" was not completed, nor was the house package delivered.

Weeden later ascertained that Towne & Country had paid Excel only $7,629.[2] Of the $33,928 deposit, according to the Monahans, $7,000 had been allocated for the foundation, $1,800 for the concrete floor, and $2,000 for the excavation, which should have left $23,128 in their possession, to complete the acquisition of the house package, but that is not what happened. Instead, Weeden had to come up with the following additional funds to finish just the initial stage of the project begun by the Monahans: $850 for the excavation; $6,507.26 to complete the foundation and knee-wall; and $200 to release a mechanic's lien on her property relating to non-payment of a Monahan supplier. Of the $33,928 deposit paid to the Monahans, Weeden received the benefit of only $18,429,[3] and in all, was required to expend $86,706 to com-

---

1. However, the construction lender did question the need for such a large deposit, and would agree to fund only one half of the $33,928.

2. Debtors' check # 975 dated July 13, 1988 in the amount of $7,629 to Turn Key Housing, Inc. is the only recorded payment by the Monahans to Excel.

3. Weeden received the value of the excavation work, $2,000; the concrete floor, $1,800; the foundation, $7,000; and, the Excel deposit (credited to her), $7,629.

plete the house ($13,278 over the contract price).

## DISCUSSION

Section 523(a)(2) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.     .     .     .     .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the insider's financial condition;

■ In actions brought under this Section of the Code, the burden of proof is on the party seeking the exception from discharge. *See In re Fenninger,* 49 B.R. 307, 309 (Bankr.E.D.Pa.1985). At the time of the hearing, the Circuits were split as to the evidentiary standard to be applied in § 523(a)(2) proceedings.[4] On January 15, 1991, however, the United States Supreme Court ruled in a unanimous decision, that "preponderance of the evidence" is now the standard to be applied in all § 523(a) proceedings. *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *Grogan* reversed the law of the Eighth Circuit, as well as the law in a majority of the Circuits which had imposed the "clear and convincing" standard on a defrauded creditor's claim under § 523(a)(2). Accordingly, pursuant to the directive of the United States Supreme Court, we view the evidence herein under the more permissive standard (now the uniform law of the land), which is a departure from this Court's prior

long standing practice. *See, e.g., In re Salvatore,* 46 B.R. 247, 250 (Bankr.D.R.I. 1984); *In re Beleau,* 35 B.R. 259, 261 (Bankr.D.R.I.1983); *In re Infantolino,* 24 B.R. 667, 668, 670 (Bankr.D.R.I.1982). *See also In re Guimond,* 122 B.R. 170, 171 (Bankr.D.R.I.1990).

Thus the plaintiff is now required to prove, by only a preponderance of the evidence, that:

(1) the debtors made representations;

(2) which at the time they knew were false;

(3) that such representations were made with the intent and purpose of deceiving the creditor; and,

(4) that the creditor relied on said representations, to his/her detriment.

■ We find these four elements to be all that are required to make out a § 523(a)(2)(A) claim, and disagree with and therefore reject those cases which place the additional requirement of "reasonable" reliance on a § 523(a)(2)(A) cause of action. It is this Court's conclusion that the reasonable reliance issue is limited to causes of action under § 523(a)(2)(B)(iii) for written statements concerning the debtor's or insider's financial condition, and is not a required element of subsection (A). *Compare Fenninger,* 49 B.R. at 309, *In re Teal,* 35 B.R. 360, 361 (Bankr.E.D.Pa.1984); *In re Gillespie,* 11 B.R. 167, 169 (Bankr.D.Or. 1981); and *In re McIntyre,* 64 B.R. 27 (D.N.H.1986) *with In re Ophaug,* 827 F.2d 340 (8th Cir.1987).[5]

■ While we certainly subscribe to the principle that exceptions to discharge are to be narrowly construed in favor of the debtor, *see In re Paolino,* 75 B.R. 641, 646

---

**4.** *Compare In re Phillips,* 804 F.2d 930, 932 (6th Cir.1986); *In re Kimzey,* 761 F.2d 421, 423–24 (7th Cir.1985); *In re Black,* 787 F.2d 503, 505 (10th Cir.1986); *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1262 (11th Cir.1988); *In re Dougherty,* 84 B.R. 653 (9th Cir.BAP 1988) *with In re Braen,* 900 F.2d 621 (3rd Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991); *Combs v. Richardson,* 838 F.2d 112 (4th Cir.1988).

**5.** In *Ophaug,* the Eighth Circuit held that under § 523(a)(2)(A), a creditor need not prove that

the debtor's fraudulent misrepresentations were reasonably relied upon by the creditor, but merely that the representations were relied upon. *Ophaug,* 827 F.2d at 343. *See* H.R.Rep. No. 595, Cong., 1st Sess. 130–31 (1977), U.S. Code Cong. & Admin.News 1978, p. 5787; *In re Fosco,* 14 B.R. 918 (Bankr.D.Conn.1981). *Contra In re Howarter,* 114 B.R. 682 (9th Cir.BAP 1990); *In re Gering,* 69 B.R. 686 (Bankr.D.Kan. 1987); *In re Hill,* 44 B.R. 645 (Bankr.D.Mass. 1984). On the facts of this case, the reasonableness of Weeden's reliance is not at issue.

(Bankr.E.D.Pa.1987); *In re Marino*, 29 B.R. 797, 799 (N.D.Ind.1983); *In re Rahm*, 641 F.2d 755, 756–57 (9th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981), *abrogated on other grounds, Grogan v. Garner*, — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), and that the intent of the Bankruptcy Code is to give honest debtors a fresh economic start, we also agree that "the policy of liberality of interpretation of exceptions to discharge is not meant to protect the dishonest debtor." *Matter of Bonanza Import & Export, Inc.*, 43 B.R. 570, 579 (Bankr.S.D.Fla.1984) (citing *Bruning v. United States*, 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964)).

■ With all of the foregoing in mind, the factual issue for determination is whether the Monahans planned to use the down payment obtained from Mrs. Weeden (46% of the total contract price) for the construction of her house, or whether at the time of contracting, they intended to use the funds for purposes unrelated to the purchase and construction of the house.

The contract terms are not in dispute.[6] They provide that Weeden was to pay $73,428 for the house, with $33,928 due upon execution for the excavation, foundation, and slab work, and for payment to Excel to obtain the package; a second payment of $31,600 after completion of the exterior; and the final payment of $7,900 upon full completion. Although the Monahans repre-

sented to Weeden that the initial $33,928 was earmarked and necessary for start up expenses, the evidence is that only $7,629 was actually paid by the Monahans towards the purchase of the house package. After inquiry, Weeden was informed that the manufacturer refused to release the package without payment of the balance, whereupon she paid Excel $30,010 in January 1989, and $5,000 in March 1989. Weeden obtained these additional funds by placing a second mortgage on the property.

Sometime after Weeden made the initial payment to Towne & Country, and unknown to her at the time, the Monahans sold their business to one Charlie Harris. In September 1988, Harris "offered" to finish the Weeden job for an additional payment of $56,000, on top of the $33,928 she already paid to Towne & Country.[7]

In addition to the insufficient payment to Excel, the incomplete site preparation, and the unannounced sale of the business to Harris, the Monahans left a damaging paper trail of cash transfers from Towne & Country to themselves, as clear evidence of their inability to perform, and intent, from the outset, not to fulfill their contractual obligations to Weeden. For example, from February 15 through August 12, 1988, Towne & Country paid to Richard and Corinne Monahan personally, "advances" of $47,045. From July 8, 1988, the date of the Weeden deposit, through August 12, 1988, $20,300 was advanced to Corinne Monahan

---

6. The stipulated facts in the Joint Pretrial Statement are:
   a) That Lillian E. Weeden entered into a contract with Towne & Country Homes, Inc. to purchase and erect a modular home on land owned by the Plaintiff, located at Narrow Lane, Charle[s]town, RI.
   b) That Richard Monahan and Corinne Monahan are officers of said Towne & Country Homes, Inc.
   c) That under the terms of the contract, Plaintiff was to pay $73,428.00 for the purchase and services, and that the terms called for $33,928.00 upon execution of the contract, to be used for the foundation, concrete floor, excavation and for payment to Excel Homes for the modular home; with $31,600.00 to be paid after the house was set and the exterior complete; and that the remaining $7,900.00 would be paid when all remaining work on the house was completed.

   d) That on July 8, Plaintiff paid to Towne & Country Modular Homes, Inc., two payments totalling $33,928.00, and received a receipt for that sum.
   e) That Lillian Weeden paid Charles Stone of Stone's Trucking and Excavating the sum of $200.00 to rel[ ]ease a mechanic's lien on the property of Mrs. Weeden.
   f) That Lillian Weeden paid $850.00 to A. Santilli to complete the excavation work.
   g) That Lillian Weeden paid Stanley Construction, Inc. $6,507.26 for completion of work on the foundation so that the home could be delivered.
   h) That Plaintiff Lillian Weeden has never received any refund from the Defendants.

7. Weeden's testimony on cross examination was that Harris would finish the job for the roughly $40,000 remaining on the contract, plus an additional $16,000.

alone, who testified that this money was used to pay living expenses. At the time, she said, they were "several months behind in their expenses." At, and prior to the date of the petition, the Monahans owed unsecured creditors approximately $753,-000,[8] and it is beyond doubt that at the times relevant to this dispute, the Monahans were diverting customers' money for their personal use, without either the ability or the intent to pay any of it back.

Although "subsequent conduct contrary to a former representation by debtor does not necessarily establish the original representation to have been false," *In re Boese*, 8 B.R. 660, 662 (Bankr.D.S.D.1981), the Court is not foreclosed from viewing subsequent conduct as evidence of the debtor's intent at the time of the representation. Based upon the totality of the evidence, we find that the debtors intended to use most of Weeden's deposit money for purposes totally unrelated to their contract obligations with her. And this, as is clearly evidenced by the Monahans' subsequent conduct, is precisely what they did.

There was much testimony concerning representations made by Harris to the Monahans, little of which is relevant, and none of which militates against the obvious bad faith and fraudulent intent of the Monahans. We also reject, as blatantly transparent and biased, the testimony of Carol Habba who was "assisting" the Monahans before Harris purchased the business. She testified that the business was "one week away from profitability," and that she had counseled the Monahans against selling to Harris, suggesting that, but for Harris' involvement, the business could have met its obligations. Habba also testified authoritatively and without any hesitation, that Glenn Kozak, another customer of the Monahans, received his house "for the con-

tract price," and that the Monahans saw to it that he did not have to expend more than the contract price to complete his house. Predictably, this was confirmed to be false in light of Kozak's later testimony (which we accept) that he received *nothing* for his initial deposit of $26,000 to the Monahans. When it was over, Kozak had expended $114,000 for his $80,000 "Monahan" house.

Based upon the entire record, it is clear that the debtors did not intend, at the time they entered into the contract with Weeden, to use the deposit for the construction of her home,[9] in view of, inter alia: (1) their hopeless financial condition; (2) the advances that they needed to live on; (3) the small payment to Excel (compared with the large deposit extracted by the Monahans); and (4) the general demeanor, conduct, and lack of credibility of both Corinne and Richard Monahan, and their corroborating witnesses. Although direct evidence of state of mind is rarely available to prove actual fraud, "[t]he existence of fraud may be inferred if the totality of the circumstances present a picture of deceptive conduct by the debtor which indicates that he intended to deceive and cheat the creditor." *Fenninger*, 49 B.R. at 310 (citing *Matter of Clark*, 1 B.R. 614, 617 (Bankr.M.D.Fla. 1979)). *See also In re Higginbotham*, 117 B.R. 211, 214 (Bankr.E.D.Va.1990).

Before *Grogan*, and while this decision was under advisement and in draft form, we were prepared to find the debt nondischargeable, even under the former clear and convincing standard. With the recent Supreme Court pronouncement in *Grogan*, we need only view the evidence under the preponderance of the evidence standard.

■ In light of all of the foregoing, it is ORDERED that the Monahans' debt to Lil-

---

8. The debtors' schedules list unsecured debts of $753,519.17, and although they have attempted to explain away that grand amount, here again, their lack of credibility renders their position insupportable.

9. The *Fenninger* Court correctly noted that "fraudulent intent cannot be founded on a mere breach of contract but if the debtor signs a contract intending not to comply with its terms and later defaults ..., the contract may provide

a basis for an exception to discharge under § 523(a)(2) if the other remaining elements are satisfied." *Fenninger*, 49 B.R. at 310 (citation omitted). The Monahans' failure to perform under the terms of the subject contract is not, alone, dispositive of their intent not to perform, but is a properly considered element of fraudulent intent in a "totality of the circumstances" view, which we adopt herein.

lian Weeden in the amount of $13,278.57 [10] is determined to be nondischargeable pursuant to § 523(a)(2)(A). Additionally, because of their numerous and patently untruthful representations under oath, and in particular their insistence that Glenn Kozak received his house for the contract price, considerable additional hearing time and legal expense were required to rebut what is clearly the false testimony of both debtors, and their witness Carol Habba. Accordingly, Richard and Corinne Monahan are jointly and severally ordered to pay $750 to the attorney for the Plaintiff, specifically to compensate her for having to oppose matters that were interposed in bad faith.

Enter Judgment consistent with this Decision.

---

**10.** Although Weeden filed a proof of claim in the amount of $23,056.26, the amount of dam- ages established at trial was $13,278.57.