In re Michael B. DRESSLER, Debtor.

Fredda E. DRESSLER, Plaintiff,

v.

Michael B. DRESSLER, Defendant.

Bankruptcy No. 94–12449.
Adv. No. 95–1025.

United States Bankruptcy Court,
D. Rhode Island.

March 12, 1996.

292

Andrew S. Richardson, Providence, RI, for Michael Dressler.

Matthew McGowan, Trustee, Providence, RI.

## MEMORANDUM OF OPINION

JAMES B. HAINES, Jr.*, Bankruptcy Judge.

Fredda Dressler ("Fredda" or "plaintiff") asserts that obligations owed her by her former spouse, Chapter 7 debtor Michael B. Dressler ("Michael" or "debtor"), are excepted from discharge under § 523(a)(5) and § 523(a)(15). For the reasons set forth below, I conclude that, although a substantial portion of the indebtedness survives discharge because it is in the nature of alimony or support, the balance is discharged notwithstanding § 523(a)(15).[1]

### Facts

#### 1. Divorce.

After approximately twenty years of marriage, Fredda and Michael divorced under a final decree entered by the Rhode Island Family Court on November 19, 1993. They had resolved a number of dissolution-related issues with their December 4, 1992, property settlement agreement (the "PSA").[2]

#### 2. Pre–Divorce Work Histories.

During the course of the marriage, Michael held a management position with his family's business, Colfax, Inc. In 1992, the year of the PSA, he earned approximately $87,000.00 per year, plus substantial fringe benefits. Fredda, who had not been employed outside the home during most of the marriage, commenced part-time real estate sales in 1985 and began to work in real estate full-time in 1990. She earned $27,403.00 during 1992.

#### 3. PSA Terms.

The PSA required Michael to pay Fredda $1,363.00 per month to support the couple's two children until the older (Maurice) reached age eighteen (or graduated from high school), and thereafter (subject to negotiated or court-ordered adjustments) for the younger (Allison).[3] Michael agreed to pay Fredda $1,333.33 per month, styled as "alimony", for a period of five years, subject to termination only upon Fredda's death or six years passage.[4]

In 1992 Fredda and Michael jointly owned substantial Rhode Island real estate, including their Cranston residence; residential rental properties at 4–6–8 Benefit Street, 2 Burrs Lane and 3 Burrs Lane in Providence (the "Providence properties"); and a commercial building at 25–31 North Union Street in Pawtucket.[5] The residence, of uncertain value in 1992, was encumbered by a $247,-000.00 mortgage. The rental properties, then estimated to be worth approximately $1,000,000.00 collectively, were encumbered by mortgages of a nearly equal amount. Rhode Island Hospital Trust ("RIHT") held the primary mortgage on the Providence properties.

The PSA provided Fredda the residence. After an initial nine-month period during which Michael paid the mortgage, Fredda undertook primary responsibility for the home's financing. Michael received the Providence and Pawtucket properties, assuming primary responsibility for associated debt and obligating himself to indemnify Fredda for any losses she might sustain by virtue of her liability on the mortgage obligations the properties secured.[6]

Michael agreed to maintain life insurance in an amount sufficient to cover the rental properties' mortgage indebtedness in the event he died before they were paid.[7] He also agreed to maintain at least $500,000.00 in life insurance, over and above the rental properties' mortgage debt, potentially to

---

* For the District of Maine, sitting by designation.

1. This memorandum sets forth findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052 and Fed.R.Civ.P. 52. Unless otherwise indicated, all references to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101, *et seq.*

2. Exhibit 2. The PSA's terms were unaltered by the divorce decree.

3. Exhibit 2 at ¶ 18.

4. Exhibit 2 at ¶ 19.

5. Exhibit 2 at ¶ 12.

6. Exhibit 2 at ¶¶ 13, 15.

7. Exhibit 2 at ¶ 22.

fund a trust for the benefit of the couple's children until the younger one either graduated from, or failed to attend, college.[8] Finally, Michael agreed to pay for the children's post-secondary educations "in accordance with his financial ability" to do so.[9]

### 4. Post–Divorce Developments.

The RIHT loan secured by the Providence properties was in default when the PSA was consummated. However, Michael was in the process of negotiating with the bank a workout agreement that would release Fredda from personal liability on the obligation. That agreement never came to fruition. Shortly after the divorce RIHT foreclosed on the Providence properties, obtained a deficiency judgment against Fredda for $480,011.59, plus fees, costs and interest of $54,205.89, and liened her home.[10] It also sought to collect the deficiency from Michael.

In November 1994 Fredda, at a cost of $2,475.00 in attorneys' fees, negotiated a settlement with RIHT for $52,500.00.[11] She's paid the legal bill, but still owes her father the money she borrowed from him to fund the settlement: $52,500.00, plus interest.[12]

In September 1994 Fredda sold the Cranston residence, netting approximately $70,000.00.[13] She continues to work as a real estate broker. Her earnings for 1995 approached $40,000.00. Fredda presently has a little over $150,000.00 in the bank.

In April 1995 Fredda remarried. Her husband has substantial assets and a six-figure annual income. Under the terms of a prenuptial agreement, he has no responsibility for her separate debts, including those resulting from the RIHT foreclosure.[14] He testified, however, that he intends to support her comfortably.[15]

Michael continues to hold stock in Colfax, Inc., and to serve as its treasurer. In 1994 his income was $130,170.00.[16] His 1995 salary was approximately $100,000.00, plus substantial fringe benefits including a country club membership, a company-leased car, and a generous expense account. Considering those benefits, Michael's total income from employment for 1995 nearly matched (and may have exceeded) his 1994 earnings.[17] Michael remarried in 1994. He lives in Massachusetts with his wife and their young son.

### Discussion

Although the plaintiff's complaint originally sought dischargeability determinations on multiple divorce-related claims, the only obligations before me are (1) alimony at $1,333.00 per month; (2) the $52,500.00 paid to RIHT to settle its deficiency claim; (3) $2,475.00 in attorneys' fees attributable to negotiating the RIHT settlement; and (4) Michael's obligation to maintain life insurance in connection with the RIHT obligation and for the benefit of the Dresslers' children.[18]

8. *Id.*

9. Exhibit 2 at ¶ 21.

10. Exhibit 5.

11. Exhibits 6, 8.

12. A demand note memorializes the borrowing. Exhibit 7.

13. Exhibit 12.

14. Exhibit 11.

15. The prenuptial agreement bears that statement out. *See, e.g.,* Exhibit 11 at ¶ 8 (making provisions for Fredda and minor daughter to reside at husband's separately-owned home or suitable substitute in the event of separation, divorce or husband's death).

16. Trial Stipulation ¶ 15.

17. Michael acknowledged that, notwithstanding Colfax's 1995 cost-cutting measures, he still enjoyed most all of the fringe benefits he had historically received. Some variations in Michael's calendar year income are attributable to the timing (December vs. January distribution) of executive bonuses.

18. Although the precise amount of child support Michael is presently required to pay is uncertain, he does not contest its non-dischargeability under § 523(a)(5). It is unclear whether the parties finally negotiated a reduced support payment following Maurice's graduation from high school or whether a state court order adjusting the payment will be required.

Michael also accepts as nondischargeable his obligation to finance his children's post-secondary educations to the extent he is able.

### 1. § 523(a)(5).

Applying § 523(a)(5) has become a common exercise for the bankruptcy courts. To assess its applicability in this case involves a trek over well-trod ground.

### a. The Statute.

The Code excepts from discharge any debt—

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
>
> > (A) such debt is assigned to another entity voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 402(a)(26) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or
> >
> > (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support. . . .

11 U.S.C. § 523(a)(5).

### b. The Substance of the Section.

■ In the context of § 523(a)(5), "substance prevails over form." *Warren v. Warren (In re Warren)*, 160 B.R. 395, 398 (Bankr.D.Me.1993); *see Sweck v. Sweck (In re Sweck)*, 174 B.R. 532, 534 (Bankr.D.R.I. 1994) (Code requires the bankruptcy court "to determine the nature of the debts, regardless of the labels placed on them by the parties or the family court."); *see also Gibbons v. Gibbons (In re Gibbons)*, 160 B.R. 473, 475 (Bankr.D.R.I.1993); *Stitham v. Stitham (In re Stitham)*, 154 B.R. 1, 3 (Bankr. D.Me.1993); *Zalenski v. Zalenski (In re Zalenski)*, 153 B.R. 1, 2 (Bankr.D.Me.1993);

*Young v. Young,* 72 B.R. 450, 452 (Bankr. D.R.I.1987).

■ Applying federal principles, the bankruptcy court must examine the circumstances that existed at the time that the obligation was created to ascertain whether it then functioned to provide support to the non-debtor obligee. *In re Sweck,* 174 B.R. at 535; *In re Stitham,* 154 B.R. at 4 n. 8; *see Fitzgerald v. Fitzgerald (In re Fitzgerald),* 9 F.3d 517, 520 (6th Cir.1993) (distinguishing *Long v. Calhoun (In re Calhoun),* 715 F.2d 1103 (6th Cir.1983)); *Sampson v. Sampson (In re Sampson),* 997 F.2d 717, 723 (10th Cir.1993); *Gianakas v. Gianakas (In re Gianakas),* 917 F.2d 759, 763 (3rd Cir.1990); *Sylvester v. Sylvester,* 865 F.2d 1164 (10th Cir.1989); *Forsdick v. Turgeon,* 812 F.2d 801 (2d Cir.1987); *Draper v. Draper,* 790 F.2d 52, 54 (8th Cir.1986); *Harrell v. Sharp (In re Harrell),* 754 F.2d 902, 906 (11th Cir.1985); *Boyle v. Donovan,* 724 F.2d 681, 683 (8th Cir.1984).[19] In evaluating obligations created by a divorce settlement agreement, the parties' intention is a " 'crucial element.' " *In re Gibbons,* 160 B.R. at 475 (quoting *In re Young,* 72 B.R. at 452); *see In re Gianakas,* 917 F.2d 759, 762.

■ To assay the character of obligations arguably in the nature of alimony or support, the courts have coined and applied a number of multi-factor tests. Although the tests vary one from another in detail, their essence is to ascertain and appreciate the dissolution dynamics that led to the obligations' creation and how these obligations functioned under extant circumstances. *See In re Gibbons,* 160 B.R. at 475 (acknowledging variety of tests employed by other courts); *In re Stitham,* 154 B.R. at 3–4 & n. 8 (applying four factor test but noting existence and substantive similarity of others). For an obligation with any given characteristics, one test may be more appropriate than another. *See, e.g., In re Warren,* 160 B.R. at 399 (referring to factors pertaining to whether obligation to pay college expenses constituted support); *In re Stitham,* 154 B.R. at 2–3 (applying four factor test to determine whether short-term

---

**19.** Although not bound by it, a bankruptcy court's § 523(a)(5) analysis appropriately may consider the substance of the state law under which the obligation arose. *See Pauley v. Spong (In re Spong),* 661 F.2d 6, 9 (2d Cir.1981); *see also In re Warren,* 160 B.R. at 398–99.

lump sum payment constituted alimony or support); *Wheeler v. Wheeler (In re Wheeler)*, 122 B.R. 645, 646–47 (Bankr.D.R.I.1991) (applying seven factor test regarding debt assumption agreement). Regardless of the analytical paradigm employed, each case turns on its own peculiar facts. *See In re Gibbons*, 160 B.R. at 475.

#### c. Burden of Proof.

██ We start with the assumption that discharge is favored under the Code. *In re Stitham*, 154 B.R. at 3. The party seeking to establish a § 523(a)(5) discharge exception carries the burden of proving the elements of nondischargeability by a preponderance of the evidence. *In re Sweck*, 174 B.R. at 535 (citing *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991)); *In re Stitham*, 154 B.R. at 3; *Weeden v. Monahan (In re Monahan)*, 125 B.R. 697, 699 (Bankr.D.R.I.1991).

#### d. Applying § 523(a)(5).

#### i. The Alimony Obligation.

██ The PSA styles as alimony Michael's obligation to pay $1,333.33 per month to Fredda for five years. At the time it was negotiated, after a twenty-year marriage, Michael enjoyed a stable position with his family's business, earning in salary about three times what Fredda earned as a real estate industry neophyte. Michael conceded at trial that the monthly payments were intended to "support" Fredda.[20] Since the divorce, the parties have treated Michael's monthly payments on this obligation as alimony on their personal income tax returns.

The parties do not dispute that they agreed upon an alimony obligation that would not terminate on Fredda's remarriage. Michael argues that the debt therefore cannot be alimony because Rhode Island statutory alimony ceases upon the obligee's remarriage.[21] But just because a Rhode Island court could not impose an alimony obligation that endured beyond remarriage does not mean that it would not honor, as it did here, an agreement creating such alimony. *Cf. Molak v. Molak*, 639 A.2d 57, 58 (R.I.1994) (holding that a property settlement agreement that is not merged into the final divorce decree is governed by contract principles); *Riffenburg v. Riffenburg*, 585 A.2d 627, 630–31 (R.I.1991) (holding that a nonmerged separation agreement retains the characteristics of a contract and binds the parties independently of the related divorce judgment); *Centazzo v. Centazzo*, 556 A.2d 560, 562 (R.I. 1989); *see also* Exhibit 2 at ¶ 11 (stating that the property settlement agreement is "incorporated into any decree of [the] Court by reference, but shall not be merged into or within any judgment"); *cf. also In re Warren*, 160 B.R. at 399–400 (settlement agreement-based obligation to pay education expense was in the nature of support, even though state law did not empower court to order such payments over objection); *In re Sampson*, 997 F.2d at 724 (holding nondischargeable debtor's obligations to ex-spouse which debtor characterized as a property settlement since they were styled to survive remarriage); *Biggs v. Biggs (In re Biggs)*, 907 F.2d 503, 505 (5th Cir.1990) (holding that debtor's divorce agreement obligation to his

---

20. Other evidence bears out the point. According to Michael's divorce counsel, the obligation was negotiated to provide Fredda a sum certain. Payment extended over five years because Michael did not have the funds in hand to pay it in a lump sum. But the amount did not approximate Fredda's projected share of an equitable property distribution. Michael had proffered persuasive argument that much of the "couple's" wealth would, in the end, be determined to be his sole property. Thus, it appears that the parties agreed to "lump sum alimony" (with payment in installments by necessity) because, regardless of equitable distribution rights, Fredda needed a supplement to her earnings in order to continue to live in the manner to which she been accustomed during the marriage.

21. *See* R.I.Gen. Laws § 15–5–16(C) (1956):

For the purposes of this section, alimony shall be construed as payments for the support or maintenance of either the husband or the wife. Alimony is designed to provide support for a spouse for a reasonable length of time to enable the recipient to become financially independent and self sufficient. Provided, however, that the court may award alimony for an indefinite period of time when the same is appropriate in the discretion of the court based upon the factors set forth in § 15–5–16(b)…. Upon the remarriage of the spouse who is receiving alimony, the obligation to pay alimony shall automatically terminate at once.

former spouse was nondischargeable alimony even though state law did not provide for alimony awards); *Benich v. Benich (In re Benich)*, 811 F.2d 943, 945 (5th Cir.1987) (determining that permanent monthly payments to non debtor spouse constituted nondischargeable alimony payments despite a state law bar against permanent alimony); *Boyle*, 724 F.2d at 683 (holding that the debtor's promise to pay sons' college expenses was in the nature of support despite no duty to pay post secondary school expenses under state law); *In re Harrell*, 754 F.2d 902, 905 (holding nondischargeable debtor's obligation to pay for child's post-majority educational expenses despite the absence of such a duty under a state law); Uniform Marriage and Divorce Act § 316(b), 9A U.L.A. (West 1987) (obligation to pay maintenance terminates at death or remarriage of receiving spouse unless the parties agree otherwise). Nor does it mean that a bankruptcy court, applying federal law principles under § 523(a)(5) could not conclude that the obligation was "in the nature of" alimony or support and, therefore, excepted from discharge. *See, e.g., In re Warren*, 160 B.R. at 398; *see generally Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 878 (10th Cir. 1986) (federal concept of obligations "in the nature of" alimony, support or separate maintenance is necessarily broader than state law definitions); *In re Harrell*, 754 F.2d at 905 ("Congress did not intend dischargeability to be determined by reference to a state law legal duty of support.").

In light of the disparity of incomes at divorce, comparative work histories and prospects, the length of the marriage, the parties' consistent tax treatment of the payments and, most importantly, their conceded purpose (to provide post-divorce support for Fredda), I conclude that, by any test, Michael's PSA-based alimony obligation is for § 523(a)(5) purposes exactly what it purports to be: alimony. It will be excepted from discharge.

### ii. The Hold Harmless Obligation.

■ Fredda further asserts that Michael's obligation to indemnify her and hold her harmless regarding the RIHT note secured by the Providence properties constitutes an alimony or support debt and, therefore, that it, too, cannot be discharged. Michael asserts that the PSA created the obligation as an adjunct of its property division terms.

■ Debt assumption and hold harmless agreements are common features of divorce-related property settlements and court decrees. Unlike lump sum or installment payment covenants they do not put money into the pocket of their beneficiary. Rather, they operate to *protect* (to the extent possible) one spouse from liability or, as here, from potential liability.[22] The protection they afford may provide essential maintenance or support. *See In re Young*, 72 B.R. at 452 ("[a]ssignment of marital debts to the debtor in a divorce decree with a concomitant 'hold harmless' agreement can be a nondischargeable obligation if it is actually intended as maintenance or support for a former spouse or child of the debtor.")

■ To determine whether this particular debt assumption/hold harmless provision was intended to function as alimony or support under the PSA, I will analyze the evidence in view of the following factors:

1. the nature of the obligation assumed (whether for necessaries or luxuries);

2. the type of payment (lump sum or installment);

3. the length of the marriage;

4. whether children of the marriage must be provided for;

5. the relative earning power of the spouses;

6. the adequacy of support without the debt assumption;

7. the understanding of the parties concerning the agreement.

*In re Wheeler*, 122 B.R. at 647 (citing *In re Young*, 72 B.R. at 453; *Petoske v. Petoske (In re Petoske)*, 16 B.R. 412, 413–14 (Bankr. E.D.N.Y.1982)). The seven-factor test is not

---

**22.** As this case demonstrates, the protection is seldom perfect. If the creditor involved does not release the "protected" ex-spouse from the obligation, he or she may still be liable to the creditor and, ultimately, forced to look to the "protecting" ex-spouse for indemnity.

a perfect fit for this case, but it provides a useful starting point. I invoke it as a compass, not a talisman.

*1. Nature of the Obligation.* Michael and Fredda incurred the RIHT debt while jointly pursuing an ill-fated real estate investment strategy.[23] The debt is a business debt, plain and simple.

*2. The Type of Payment.* The PSA anticipates an installment payment in the sense that the couple expected that Michael would negotiate a workout with the bank and pay the mortgage over time. Although the debt was in default, it was only post-PSA developments that led to RIHT's foreclosure and collection activities.

*3. Length of the Marriage.* The Dresslers had been married about twenty years, and when the PSA was negotiated Fredda was just attaining the ability to support herself independently.

*4. Whether Children Must Be Provided For.* The Dresslers had two dependent children at the time of the PSA. The agreement called for handsome payments from Michael to Fredda for both alimony and child support.

*5. Relative Earning Power.* As discussed above, Michael's earning power far exceeded Fredda's.

*6. The Adequacy of Support Without Debt Assumption.* Although Michael and Fredda recognized the RIHT mortgage obligation as a problem, they saw it as a problem that would be resolved. Neither party had a crystal ball to foretell foreclosure and a staggering deficiency. As it turned out, the RIHT deficiency was of a size that, if Fredda had been forced to pay it alone, it would have rendered Michael's alimony and support payments insufficient to keep her household afloat. But the important observation is that *at the time of the PSA* neither Michael nor Fredda anticipated that RIHT's claims would "come home to roost" with devastating consequences.

*7. Expectations of the Parties.* In 1992 Michael and Fredda had every expectation that the RIHT debt would be restructured and that Fredda would be released from liability. Thus, Michael's assumption/hold harmless undertaking was highly contingent. Both Michael and Fredda assumed that (even if Fredda remained liable) the Providence properties would generate income (and have sufficient value if sold) to satisfy the bank.

I conclude that the debt assumption/hold harmless obligation was not intended and did not serve as alimony or support under the PSA. On the contrary, the RIHT mortgage obligation was a business debt associated with certain of the Dresslers' properties. With the knowledge that neither of them could afford to pay off the bank if their real estate venture went awry, they decided that, as between them, the debt would follow the property to Michael. Even though it's clear that Fredda could shoulder debt even less easily than Michael, that alone is not enough to color the arrangement as support, particularly in view of the separate, extensive arrangements otherwise made for alimony and child support. Michael's obligation under the PSA's debt assumption/hold harmless clause is not excepted from discharge under § 523(a)(5).

#### iii. The Life Insurance Obligation.

■ Because I conclude that the debt assumption/hold harmless obligation is not excepted from discharge under § 523(a)(5), it follows that Michael's undertaking to carry life insurance in an amount sufficient to satisfy the RIHT debt in the event of his death is not a § 523(a)(5) obligation either.

■ However, because Michael concedes that his agreement to pay for his children's college educations, to the extent he is financially able, created a nondischargeable debt, Fredda argues that he cannot be discharged from the assertedly associated obligation that he maintain at least $500,000.00 in life insurance for the children's benefit until they have finished, or finished attending, college. The argument cannot succeed for several reasons.

---

**23.** The Pawtucket property remains Michael's. He manages it and continues to pay the mort- gage.

Paying insurance premiums furnishes some security against calamity, but provides no contemporaneous support. Moreover, Michael's PSA-imposed responsibility for college expenses is limited by the condition that he is so obligated only to the extent of his financial ability. Maintaining life insurance at the $500,000.00 level is not necessarily consistent with that burden. If Michael one day has scarce resources to pay the tab for college, should he be required to pay life insurance premiums instead? What's more, the $500,000.00 insurance requirement bears no meaningful relation to the extent of unpaid college expenses as may exist for either or both children should Michael die.[24] I cannot agree that the insurance maintenance obligation escapes discharge under § 523(a)(5).

### 2. Section 523(a)(15).

The fact that the debt assumption/hold harmless obligation is not within § 523(a)(5)'s dischargeability exception does not end the inquiry. Fredda also asserts nondischargeability under § 523(a)(15), a Code provision added in 1994 specifically to deal with dischargeability of divorce-related debts other than those "in the nature of" alimony support or separate maintenance.

Here, we leave the beaten path. Section 523(a)(15) is relatively new and is not yet the subject of authoritative case law in the First Circuit or this district. Moreover, the statute is awkwardly drawn, leading the courts that have considered it to disparate notions of how it is to be applied.

### a. The Statute.

Section 523(a)(15) excepts from discharge any debt—

> not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with

State or territorial law by a governmental unit unless—

> (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse or child of the debtor.

11 U.S.C. § 523(a)(15).

### b. The Substance of the Section.

Section 523(a)(15) was added to the Code in 1994 in response to concerns that § 523(a)(5), the statute's previously solitary discharge exception for divorce-related debts, was inadequate to strike a fair balance between a divorced debtor's discharge and the needs of that debtor's former spouse or family. Under § 523(a)(5), the bankruptcy court determined nondischargeability by assessing whether the debt at issue was "in the nature of alimony, support or separate maintenance" (nondischargeable) or something else, usually a property settlement obligation (dischargeable). *Collins v. Hesson (In re Hesson)*, 190 B.R. 229, 233 (Bankr.D.Md.1995). Although § 523(a)(5) spawned flexible analyses aimed to ascertain as best the courts could the "true" function of divorce-created obligations,[25] Congress concluded that the operation of § 523(a)(5) on dissolution-related debts was unsatisfactory for several reasons.

For one thing, the reality of modern divorce judgments and property settlement agreements is that the characterization of obligations they create is, as often as not, the product of factors not always taken into account in § 523(a)(5) dischargeability determi-

---

**24.** Indeed, it appears that if Michael should pass away when the younger child was in her last semester of school, and the older child had already graduated, $500,000.00 would nevertheless fund a trust in which each would share equally.

**25.** *See* discussion *supra* at 295–96.

nations. For example, how much child support or alimony one party receives may be a function of the extent and timing of property division payments. One party may bargain to have an obligation (or payment) labeled one way or the other for tax purposes in return for some offsetting concession. Or the parties might sign off on a form agreement without a second thought to the way it characterizes reciprocal rights and obligations. Divorcing couples are generally concerned with the economic consequences of divorce, rather than the labels that attach to the arrangement's components. *Id.* at 233 (citing Epstein, Nickles & White, *Bankruptcy* § 7–29 (1992); Jana B. Singer, *Divorce Obligations and Bankruptcy Discharge: Rethinking the Support/Property Distinction,* 30 Harv.J. on Legis. 43, 113–14 (1993)); H.R.Rep. No. 835, 103d Cong., 2d Sess. § 304 (1994) U.S.Code Cong. & Admin.News 1994, pp. 3340, 3363; *see generally* 3 *Norton Bankruptcy Law and Practice 2d* § 47:33 at 47–72 (1994) [hereinafter *"Norton"*]. For another, Congress perceived that divorce "obligors were able to craftily draft settlement agreements to be in property, rather than in alimony terms and then discharge their marital obligations in bankruptcy." *Kessler v. Butler (In re Butler),* 186 B.R. 371, 373 (Bankr.D.Vt.1995) (citing *Hill v. Hill (In re Hill),* 184 B.R. 750, 752–53 (Bankr. N.D.Ill.1995)) (footnote omitted).

Thus, no matter how painstakingly the bankruptcy court's retrospective analysis attempted to reconstruct a state court judge's intentions in setting a divorce decree's terms, *In re Sweck,* 174 B.R. at 535; or the parties' intentions in negotiating a divorce settlement agreement, *In re Stitham,* 154 B.R. at 4 n. 8, *see also In re Gianakas,* 917 F.2d at 763; *In re Hesson,* 190 B.R. at 233, the results were

less than perfect and often resulted in undesirable hardships for the nondebtor spouse and his or her dependents. *In re Gianakas,* 917 F.2d at 762; H.R.Rep. No. 835, 103d Cong., 2d Sess. § 304 (1994); *Norton* § 47:35.5 (1994 & Supp.1995); 3 King, *Collier on Bankruptcy* ¶ 523.19E at 523–177 (15th ed. 1995) [hereinafter *"Collier"*].

■■■ Congress enacted § 523(a)(15) in an attempt to lessen the chance that a divorce obligee's claims might slip through § 523(a)(5)'s cracks and be discharged unjustly. Thus, § 523(a)(15) now excepts from discharge non-alimony debt, incurred by the debtor in connection with divorce proceedings if (1) the debtor can afford to pay it (§ 523(a)(15)(A)) *and* if discharge would result in detriment to the obligee that outweighs the benefit of discharge to the debtor.[26] *See, e.g., In re Hesson,* 190 B.R. at 233–34; *In re Butler,* 186 B.R. at 373; *In re Hill,* 184 B.R. at 752–53.

■■■ Unlike § 523(a)(5)'s "rear view mirror" analysis, § 523(a)(15) instructs us to look out the windows. It calls for a "current circumstances" review of non-support divorce obligations and the consequences of discharge upon them. I conclude that the appropriate time to appraise those circumstances is as of the trial date. As one court recently observed:

> In a § 523(a)(15) case, the court is not dealing with the court's or the parties' intent at the time of the decree or agreement. Instead, the court is directed to determine the debtor's ability to pay the debt and weigh the benefit of discharging the debt against the detrimental consequences to the recipient. . . .

**26.** The foregoing paraphrase, providing a straightforward, plausible reading of the section's substance, eliminates the statute's troublesome triple negative construction. It is drawn from *In re Butler,* 186 B.R. at 373. As Butler observed, "Congress has decided that if a debtor is able to pay the debt owed to the ex-spouse without harming him or herself more than non-payment would harm the ex-spouse, the debtor should uphold his or her separation obligation." *Id.* In other words, if the debt is to be excepted from discharge it must be shown (subject to the burden of proof requirements set forth below)

*both* that the debtor can afford to pay it and that the balance of benefits and detriments favors the obligee. If the debtor cannot afford to pay, the debt is discharged. And if the balance favors discharge, the debt will be discharged whether or not the debtor can afford to pay. *See, e.g., Owens v. Owens (In re Owens),* 191 B.R. 669, 673 (Bankr.E.D.Ky.1996); *Woodworth v. Woodworth (In re Woodworth),* 187 B.R. 174, 177 (Bankr. N.D.Ohio 1995); H.R.Rep. No. 835, 103d Cong., 2d Sess. § 304 (1994); *Norton* § 47:35.5 (1994 & Supp.1995); *Collier* ¶ 523.19E at 523–177.

This is not a historical search, but as with a student loan inquiry under § 523(a)(8) is an examination of current circumstances. For example, after the filing of the case, either party might have sustained a disabling injury or may have won the lottery, or have experienced a substantial change in earnings. Post-filing events could easily affect either the debtor's ability to pay the debt or the balance between debtor's benefit from discharge and the detrimental consequences of discharge to the recipient. Use of a time substantially before the trial date could produce a silly result that mocks congressional intent.

*In re Hesson,* 190 B.R. at 238 (citations omitted); *see also Taylor v. Taylor (In re Taylor),* 191 B.R. 760, 765 (Bankr.N.D.Ill. 1996) (noting split of authority); *Anthony v. Anthony (In re Anthony),* 190 B.R. 433, 438 *reconsideration denied,* 190 B.R. 429, 431 (Bankr.N.D.Ala.1995) (stating that the relevant time of inquiry is the filing of the petition, but evaluating changes in debtor's economic circumstance post petition); *Becker v. Becker (In re Becker),* 185 B.R. 567, 570 (Bankr.W.D.Mo.1995) (stating that the relevant time of inquiry is "the time of the bankruptcy," but looking at economic changes post petition); *Carroll v. Carroll (In re Carroll),* 187 B.R. 197, 200 (Bankr. S.D.Ohio 1995) (stating that the relevant time of inquiry is the filing of bankruptcy); *In re Hill,* 184 B.R. at 754 (holding that the relevant time of inquiry is the date of the filing of the complaint).[27]

### c. Burden of Proof.

Section 523(a)(15)'s awkward articulation has generated a procedural conundrum preceding its application. If, as Judge Conrad observed in *In re Butler,* it may be said that the "use of triple negatives in [§ 523(a)(15)] has turned an otherwise well intended statute into sausage," 186 B.R. at 373, the grow-

ing disagreement among courts as to whether, and how, the subsection operates to alter settled principles regarding the burden of proof in creditor-initiated dischargeability disputes threatens to make it hash.

Although one court has opined that burden of proof "is not a critical issue" because "[r]arely is [the] evidence in equipoise," *In re Hesson,* 190 B.R. at 238; the burden's allocation in § 523(a)(15) litigation can make a difference. *See, e.g., Collins v. Florez (In re Florez),* 191 B.R. 112, 115 (Bankr.N.D.Ill. 1995) (placing burden of proof on debtor as to subparts (A) and (B) and concluding that the debt would not be discharged because the debtor chose to present evidence only as to "ability to pay" (subpart (A)). And to the extent that the elements of subparts (A) and (B) are deemed true affirmative defenses, *see In re Owens,* 191 B.R. 669, 673; *In re Hill* 184 B.R. at 753, principles of pleading and waiver apply. *See In re Hill,* 184 B.R. at 753 (debtor must plead and prove inability to pay or overriding benefit of discharge as affirmative defenses); Fed.R.Bankr.P. 7012(b) (incorporating by reference Fed.R.Civ.P. 12(b)). Only if the rules assigning the burden of proof and the burden of production are clear can the parties fairly prepare for trial and present their cases.

Section 523(a)(15) contains no express burden of proof allocation. The Federal Rules of Bankruptcy Procedure are silent on the subject. *See In re Butler,* 186 B.R. at 373; *cf.* Fed.R.Bankr.P. 4005 (burden of proof is on party objecting to discharge under § 727). But, as discussed above, exceptions to discharge are construed narrowly. *Gleason v. Thaw,* 236 U.S. 558, 561, 35 S.Ct. 287, 288–89, 59 L.Ed. 717 (1915); *Century 21 Balfour Real Estate v. Menna (In re Menna),* 16 F.3d 7 (1st Cir.1994); *Bombardier v. Baietti (In re Baietti),* 189 B.R. 549, 554 (Bankr.D. Me1995) (citing cases); *Weeden v. Monahan (In re Monahan),* 125 B.R. 697, 699–700 (Bankr.D.R.I.1991); *see T I Fed.*

**27.** Although the trial date is the appropriate point to undertake § 523(a)(15)'s "current circumstances" analysis, the court must critically assess the debtor's expenses under the "disposable income" test, discussed *infra,* to ensure that reaffirmed and postpetition indebtedness does not unreasonably suppress his or her "ability to

pay." *See In re Owens,* 191 B.R. 669, 672, 674 (deciding that hold harmless agreement with exspouse was nondischargeable based partially on a computation of debtor's income that did not include the reaffirmation of a technically dischargeable loan).

*Credit Union v. Delbonis,* 72 F.3d 921, 937 (1st Cir.1995); *Boudakian v. Boudakian (In re Boudakian),* 137 B.R. 89, 92 n. 2 (Bankr. D.R.I.1992). And the Supreme Court's dictum in *Grogan v. Garner, supra,* makes it clear that it falls to a creditor bringing a nondischargeability action under § 523(a) to prove its case by a preponderance of the evidence.[28]

Nevertheless, a number of courts have determined that § 523(a)(15) establishes a regime that shifts burdens of proof, or burdens of production. One bankruptcy court recently summarized the burgeoning burden of proof case law, applied burden shifting and noted that this is an area over which confusion reigns:

> In order to except the debt from dischargeability under § 523(a)(15), [the non debtor spouse] must establish that she holds a claim against [the debtor] other than the kind described in § 523(a)(5), that was awarded by a court in the course of a divorce proceeding or separation. *See Silvers v. Silvers (In re Silvers),* 187 B.R. 648, 649 (Bankr.W.D.Mo.1995). That has been done in this matter and is not in dispute. Once [the non debtor spouse] demonstrates this, the burden of coming forward shifts to [the debtor] to show either (1) that he lacks the ability to pay the debt from income or property not needed to support himself and any dependents, or (2) that discharge would be more beneficial to [the debtor] than detrimental to the [non debtor spouse]. *Hill v. Hill (In re Hill),* 184 B.R. 750, 752–54 (Bankr.N.D.Ill. 1995); *Florio v. Florio (In re Florio),* 187 B.R. 654, 657 (Bankr.W.D.Mo.1995); *Phillips v. Phillips (In re Phillips),* 187 B.R. 363, 368–69 (Bankr.M.D.Fla.1995); *[In re] Silvers,* 187 B.R. at 649 (burden of going forward, not burden of proof shifts to the debtor); *Carroll v. Carroll (In re Carroll),* 187 B.R. 197, 200 (Bankr.S.D.Ohio 1995);

> *Collins v. Hesson (In re Hesson),* 190 B.R. 229, 239–40 (Bankr.D.Md.1995) (the burden of going forward and the burden of proof is bifurcated—if the debtor can show inability to pay the debt the examination stops; if debtor can make the payment, the plaintiff has the burden to show that the detrimental consequences outweigh the benefit to the debtor). *But see Becker v. Becker (In re Becker),* 185 B.R. 567, 569 (Bankr.W.D.Mo.1995) (burden of proof shifts to the debtor after creditor brings dischargeability action under § 523(a)(15)); *contrast Kessler v. Butler (In re Butler),* 186 B.R. 371, 375 (Bankr.D.Vt.1995) (the creditor bears the burden of persuasion; disagrees with *Becker* that § 523(a)(15) creates a rebuttable presumption that property settlements are nondischargeable unless the debtor can prove two exceptions). The whole area of which party has what burden under § 523(a)(15) is clearly in need of legislative remediation and clarification.

*In re Taylor,* 191 B.R. 760, 764; *see In re Florez,* 191 B.R. at 115; *In re Anthony,* 190 B.R. at 432 & n. 3; *see also Straub v. Straub (In re Straub),* 192 B.R. 522, 527 (Bankr. D.N.D.1996) (stating that § 523(a)(15) establishes a rebuttable presumption); *Slover v. Slover (In re Slover),* 191 B.R. 886, 891 (Bankr.E.D.Okl.1996) (stating that § 523(a)(15) establishes a rebuttable presumption). *But see In re Butler,* 186 B.R. at 374; *Woodworth v. Woodworth (In re Woodworth),* 187 B.R. 174, 177 (Bankr.N.D.Ohio 1995) (citing *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) and stating that the creditor bears the burden of proof).

I am unconvinced that burden shifting doctrines are required by § 523(a)(15) or necessary to carry out its purpose. Here's why.

---

**28.** *Butler* observed:

In *Grogan,* the Supreme Court determined that the standard of proof required in § 523(a)(2)(A) hearings should be a preponderance of the evidence standard.... The Court, in dicta, reasoned that Congress' silence with respect to the standard of proof indicated that [it] did not intend to do anything special or unusual with respect to section 523.... In

discussing [§ 523(a)(2)(A)], the Court explained that Congress' silence also meant that no subsection of 523 was intended to be any different from another subsection of 523.... In fact, throughout the opinion the Court unquestionably referred to the § 523 burden as a creditor burden.

186 B.R. at 373 (footnotes and citations omitted).

To begin, *In re Butler*'s rationale is convincing. Congressional silence should not be read to overturn long-standing burden of proof rules. 186 B.R. at 373–74. Although § 523(a)(15)'s structure bears resemblance to that of § 523(a)(8) (student loan exception on which the debtor bears the burden of proof), that resemblance is insufficient to demand burden shifting under § 523(a)(15) because the context and requirements of the sections differ in telling ways.[29]

■ Moreover, the cases agreeing that some burden shifting is required or appropriate under § 523(a)(15) are in disarray. Some courts hold that allegations in support of subsections (A) and (B) are true affirmative defenses, with the burden of proof shifting to the debtor once the plaintiff proves existence of a divorce-incurred debt not within § 523(a)(5)'s scope. *See, e.g., In re Taylor*, 191 B.R. 760, 764; *In re Anthony*, 190 B.R. at 432 & n. 3; *In re Florez*, 191 B.R. at 115; *Florio v. Florio (In re Florio)*, 187 B.R. 654, 657 (Bankr.W.D.Mo.1995); *Phillips v. Phillips (In re Phillips)*, 187 B.R. 363, 368–69 (Bankr.M.D.Fla.1995); *Carroll v. Carroll (In re Carroll)*, 187 B.R. 197, 200 (Bankr. S.D.Ohio 1995); *In re Hill*, 184 B.R. at 753. Some courts consider that such debts enjoy a "rebuttable presumption," of nondischargeability while shifting to the debtor the burden of proof. *See, e.g., In re Straub*, 192 B.R. 522, 527; *In re Slover*, 191 B.R. 886, 891; *In re Becker*, 185 B.R. at 569.[30] And some courts have embraced a "bifurcated" burden of proof regime. *See In re Hesson*, 190 B.R. at 239 (once plaintiff shows debt is within § 523(a)(15), burden of production and proof shifts to debtor regarding inability to pay; then, only if debtor has met that burden, the burden shifts back to the plaintiff to show that discharge's detrimental consequences outweigh the benefits to the debtor). Under at least one formulation of this latter view, the elements of § 523(a)(15)(A), but not those of § 523(a)(15)(B) must be pleaded as an affirmative defense. *In re Hesson*, 190 B.R. at 239.

The statute and the rules do not require such procedural gymnastics. They are wholly unnecessary. Although § 523(a)(15)'s phrasing is not a model of style, Congress did not intend the section to be a complex provision. If the statute's substance can be fairly applied with simplicity, the courts should not construct procedural labyrinth around it.

■ A § 523(a)(15) plaintiff has every motivation (and ability) to demonstrate that the debtor has the ability to pay the obligation in question.[31] And the plaintiff has the motivation (and ability) to prove that the detrimental consequences of discharge out-

**29.** Student loan dischargeability proceedings are generally initiated by the debtor, who seeks a declaration of dischargeability, rather than by a creditor seeking a declaration of nondischargeability. 186 B.R. at 374. Section 523(a)(8) calls for a demonstration of the detrimental effects (upon the debtor) of non-dischargeability, while § 523(a)(15), in its own, inartful way, calls for a demonstration of the detrimental effects (upon the creditor) of discharge. *Id.* Unlike § 523(a)(8), § 523(a)(15) is not self-executing. Like §§ 523(a)(2), 523(a)(4) and 523(a)(6), it comes within § 523(c)'s strict time requirements for filing dischargeability complaints. Unless such a complaint is timely filed, the obligation is discharged. *Id.* And, as a practical matter, § 523(a)(15) claims will likely most often be asserted in the alternative to § 523(a)(5) claims. Given that fact, and the fact that § 523(c)'s dictates will likely result in more § 523(a)(5) claims being asserted in the bankruptcy court so that § 523(a)(15) claims may be asserted in tandem with them, it is illogical to construct a procedural model with different burdens of proof for the two subsections. *Id.* Rather than retrace *But-*

*ler's* analysis further, readers are referred to its text. For examples of the burden of proof allocation to debtors in § 523(a)(8), see *Berthiaume v. Pennsylvania Higher Educ. Assistance Agency (In re Berthiaume)*, 138 B.R. 516, 520 (Bankr. W.D.Ky.1992); *Burton v. Pennsylvania Higher Educ. Assistance Authority (In re Burton)*, 117 B.R. 167, 169 (Bankr.W.D.Pa.1990).

**30.** Such use of the rebuttable presumption terminology is unfortunate. Presumptions generally do not shift the burden of proof. *See* Fed.R.Evid. 301.

**31.** It *literally* goes too far to characterize § 523(a)(15)(A) as imposing a burden on one party or the other to prove that the debtor *cannot pay* the debt. Common sense reading of the statute's terms leads to an understanding that the question is really the debtor's ability *to pay*. That is something the plaintiff can explore through discovery and prove at trial. And, in light of the defendant's bankruptcy, it is entirely appropriate to put the plaintiff to his or her proof on that point. *See In re Butler*, 186 B.R. at 374.

weigh the benefits that the debtor would otherwise gain.[32] Thus, I conclude that the § 523(a)(15) plaintiff bears the burden of production and proof on all elements of dischargeability.

### d. Applying the Statute.

#### i. Nature of the Debt.

 Section 523(a)(15)'s first requirement is that the obligation be a non-alimony debt incurred by the debtor "in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record...." Thus, potential nondischargeability extends only to the obligation owed the divorce obligee and only to the extent that it was incurred in connection with a divorce or separation agreement or decree.

 If a debtor has agreed to assume a credit card obligation and hold his or her ex-spouse harmless, it is only the hold harmless obligation that may escape discharge. The debtor's obligation to the credit card company (absent some other discharge exception) will be wiped out. *In re Hesson*, 190 B.R. at 234; *In re Finaly*, 190 B.R. 312, 314–15 (Bankr.S.D.Ohio 1995); H.R.Rep. No. 835, 103d Cong., 2d Sess. § 304 (1994) (statement of Chairman Brooks), *cited in Collier* ¶ 523.19E at 523–177.[33]

Fredda's remaining claims clear this initial hurdle. Having already been determined to be outside § 523(a)(5)'s purview, Michael's debt assumption/hold harmless liability (and the requirement that he maintain insurance in an amount equal to it) are debts he owes to Fredda that he incurred under the PSA.

#### ii. Ability to Pay—§ 523(a)(15)(A).

 Cases addressing the issue are virtually uniform in utilizing § 1325(b)(2)'s "disposable income" test to evaluate evidence under § 523(a)(15)(A)'s "ability to pay" provision. *See, e.g., In re Hesson*, 190 B.R. at 237–383, 241; *In re Florez*, 191 B.R. at 115; *In re Hill*, 184 B.R. at 754–55; *see generally* Norton § 47:35.5 (1994 & Supp.1995) (noting the use of § 523(a)(8)'s analysis in § 523 cases to discharge debts only in part). *But see In re Florio*, 187 B.R. at 657 (noting the existence of a disagreement as to whether "ability to pay" should be analyzed using § 1325(b)(2)'s "disposable income" test or § 523(a)(8)(B)'s "undue hardship" test, holding that the "undue hardship" test was helpful); *Comisky v. Comisky (In re Comisky)*, 183 B.R. 883, 884 (Bankr.N.D.Cal.1995) (using 523(a)(8) analysis and discharging debt only in part). I agree that it is a suitable formulation. Section 523(a)(15)(A)'s language "essentially mirrors" that of § 1325(b)(2) and the disposable income test enables the court to determine what funds are available to the debtor to pay the obligation after deducting "reasonably necessary" expenses. *See In re Cardillo*, 170 B.R. 490, 491 (Bankr.D.N.H.1994); 1 *Lundin, Chapter 13 Bankruptcy* § 5.31 (1st ed. 1993).

Michael pleads poverty. But concluding that he has sufficient disposable income to enable him to pay his $54,975.00 hold harmless obligation to Fredda is not difficult. Michael maintains a six-figure income with valuable perquisites.[34] He lives with his new wife and their young child in an expensive home and drives a new car. He enjoys membership in a country club and a health club. His lifestyle is, to say the least, comfortable.

Although he testified to ongoing, oppressive debt notwithstanding his bankruptcy filing, Michael continues to pay almost $2,400.00 per month to live in his new home and claims that, although new, the house requires $400.00 per month in maintenance.

---

**32.** This is particularly true in light of § 523(a)(15)'s legislative history, which indicates that the benefit of the doubt should generally be given to the benefit of discharge. H.R.Rep. No. 835, Cong., 2d Sess. § 304 (1994) U.S.Code Cong. & Admin.News 1994, p. 3363 ("The benefits of the debtor's discharge should be sacrificed only if there would be a substantial detriment to the non debtor spouse that outweighs the debtor's need for a fresh start.").

**33.** Indeed, the third-party (as to whose claim the hold harmless provision runs) is without standing to press a § 523(a)(15) claim.

**34.** Although Michael was pessimistic about the future of his employer, his salary and benefits remain substantial. His assertion that the outlook for his family's business, and his continued employment, is uncertain is not convincing.

Such housing expenses are unreasonable for a family of three.

Michael also pays approximately $1,200.00 per month toward his son's college expenses, even though the PSA limits his obligation to do so if he has other, more pressing expenses. Finally, Michael testified at trial that he was comfortable negotiating a reaffirmation agreement with RIHT, for approximately $50,000.00.[35]

Michael unquestionably has the ability to pay Fredda the amounts he owes her under the PSA's debt assumption/hold harmless clause for the RIHT mortgage debt. I need not put too fine a point on this prong of the § 523(a)(15) analysis, however. The second prong proves fatal to Fredda's nondischargeability claim.

### iii. Benefit and Detriment— § 523(a)(15)(B).

Having found that Michael has the ability to pay Fredda what he owes her under the PSA's debt assumption/hold harmless clause, I must consider whether discharging the debt will result in a "benefit" to Michael that "outweighs" the resulting "detrimental consequences" to Fredda.

This is where Fredda's claim fails. She has paid the legal fees she incurred in negotiating a settlement with RIHT. She has cash in hand from which she can repay the money she borrowed to fund the settlement. She has ongoing entitlement to $1,333.33 per month in alimony, and she has the demonstrated capacity to earn upwards of $40,000.00 a year on her own.[36] Under these circumstances, Fredda has not demonstrated the character of detriment that Congress had in mind when it added § 523(a)(15) to the Code. See generally In re Taylor, 191 B.R. 760, at 763, 766 (holding that benefit to debt-

or of being discharged outweighed the detriment to creditor/ex-spouse where creditor testified that resulting harm to her was "'psychological more than anything else'").

■■■ Admittedly, the statute's directive is imprecise. But where the obligee spouse has the personal resources to survive the consequences of discharge without some consequence over and above an affordable monetary loss, excepting the obligation from discharge is not in order. In view of the statute's imprecision (or, if you will, ambiguity) its legislative history is illuminating.

> The debt will also be discharged if the benefit to the debtor of discharging it outweighs the harm to the obligee. For example, if a non debtor spouse would suffer little detriment from the debtor's nonpayment of an obligation required to be paid under a hold harmless agreement (perhaps because it could not be collected from the non debtor spouse or *because the non debtor spouse could easily pay it*) the obligation would be discharged. *The benefits of the debtor's discharge should not be sacrificed only if there would be substantial detriment to the non debtor spouse that outweighs the debtor's need for a fresh start.*

H.R.Rep. No. 835, 103d Cong., 2d Sess. § 304 (1994) U.S.Code Cong. & Admin.News 1994, p. 3363. Although it is never "easy" to pay an obligation that someone else has agreed to pay, ours is a case in which Fredda, the nondebtor spouse, can "easily pay." Michael's discharge creates for her no overriding "detrimental consequences" in the § 523(a)(15)(B) sense.[37] Because Fredda has the present ability to pay the obligation without any other demonstrated detrimental consequence, Michael's debt to her under the

---

**35.** The reaffirmation was filed with the court February 14, 1996. Doc. No. 38. Under the terms of the agreement, Michael will pay RIHT $50,000.00 without interest in weekly $200 installments. Presumably the agreement will enable Michael to retain other real estate holdings (e.g., the Pawtucket building), notwithstanding RIHT's deficiency judgment.

**36.** Fredda contends that, in light of the prenuptial agreement, her husband's assets and income are irrelevant to the § 523(a)(15)(B) analysis.

Michael argues that they are highly relevant. Although in another case the point might be important, it is not here. I have not considered Fredda's husband's resources because her personal resources and earning capacity make it unnecessary to do so.

**37.** In reaching this conclusion I have considered Fredda's obligation to her father no differently than I would consider an arms' length obligation.

PSA's debt assumption/hold harmless clause will be discharged. The same may be said for Michael's obligation to maintain life insurance in an amount sufficient to fund the hold harmless debt.

### Conclusion

For the reasons set forth above, a separate order will enter determining that the debtor's obligations to the plaintiff styled as "alimony" by the PSA are excepted from discharge. The balance of the debtor's PSA obligations, save those for child support, will be discharged.