**In re Walter ADLER III, Debtor.**

**Christina Adler, Plaintiff,**

v.

**Walter Adler III, Defendant.**

**Bankruptcy No. 97–13469.**

**Adversary No. 98–1105.**

United States Bankruptcy Court, D. Rhode Island.

Jan. 14, 2000.

---

Geoffrey A. Regan, Kirshenbaum & Kirshenbaum, Cranston, Rhode Island, for debtor/defendant.

Jules J. D'Alessandro, D'Alessandro Law Associates Inc., North Providence, Rhode Island, for plaintiff.

## OPINION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Complaint of Christina Adler to determine the dischargeability of an obligation owed by her former husband, Walter Adler, III. The debt in question arises from a property settlement agreement wherein Walter agreed *inter alia* to pay the mortgage on the marital domicile and, in the event the property was sold, continue to make the payments to his former wife for a period not to exceed 15 years. The Plaintiff initially alleged that the debt was nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), (a)(5), and (a)(15), but at the close of all the evidence, she elected to proceed only on (a)15 grounds, and abandoned all other claims. Upon consideration of the evidence and for the reasons discussed below, we find that the debt in question is nondischargeable.

### BACKGROUND/FACTS[1]

On December 31, 1984, Christina and Walter were married. There were no children of the marriage. During their 10 years together, Walter ran a successful dry cleaning business called Commodore Cleaners, which at its peak in 1995 had six locations. Christina worked in the business from 1992 until the divorce in 1995.

In July 1995, Walter informed Christina that he was involved with another woman and that he wanted a divorce. Christina agreed, and on July 6, 1995, the parties entered into a "Property Settlement Agreement" which provided *inter alia* that: (1) Walter would pay Christina $850

per month in alimony; (2) Christina would receive the marital domicile; (3) Walter would pay the mortgage, taxes, and insurance on the property; (4) if Christina sold the home and paid off the existing mortgage, Walter agreed to pay to Christina an amount equal to the mortgage balance at the time of sale, in the same monthly installments over the term specified in the original mortgage; and (5) Christina waived all of her right and interest in the dry cleaning business, as well as the home recently purchased by Walter with his girlfriend.

On September 30, 1996, Christina sold the former marital domicile for $179,000. At the time of sale the mortgage balance was $70,000, Christina netted approximately $94,000, and under the terms of the property settlement agreement Walter became liable to Christina for the $70,000 that was paid at closing, which amounts to $850 per month for a period not to exceed fifteen years. *See* Amended Joint Pretrial Order, Docket No. 12, at 1. On August 17, 1997, Walter filed a petition under Chapter 7, listing Christina as a creditor.

### DISCUSSION

■■■ Since enactment of the Bankruptcy Reform Act of 1994, debts arising from a property settlement agreement are nondischargeable, except for certain circumstances enumerated in the statute which provides that:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a

---

1. This opinion contains our findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052 and 9014.

determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor

11 U.S.C. § 523(a)(15). The provision was enacted "in an attempt to lessen the chance that a divorce obligee's claims might slip through § 523(a)(5)'s cracks and be discharged unjustly." *Dressler v. Dressler* (*In re Dressler*), 194 B.R. 290, 300 (Bankr.D.R.I.1996).

In order for the debt to be excepted from discharge, the nondebtor spouse must show that the debt arises from a separation [property settlement] agreement. The nondebtor former spouse must then show that debtor has the ability to pay such debt, and that the detrimental consequences to the nondebtor former spouse are greater than the benefits resulting to debtor from his discharge of such debt.

*In re Konick*, 236 B.R. 524, 526–27 (1st Cir. BAP 1999); *Dressler*, 194 B.R. at 300; and the Plaintiff bears the burden of proof on each element, which must be established by a preponderance of the evidence. *In re Konick*, 236 B.R. at 527; *Bushee v. Bushee* (*In re Bushee*), 211 B.R. 114, 115 (Bankr.D.R.I.1997); Dressler, 194 B.R. at 301–04.

### A. Debt Arises from a Property Settlement Agreement

The first statutory requirement is that the debt be a non-alimony obligation incurred by "the Debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record...." 11 U.S.C. § 523(a)(15). Walter's obligation to pay the $70,000 mortgage balance (or $850 per month) to Christina is clearly an obligation incurred under the property settlement agreement. *See* Exhibit A, Property Settlement Agreement, ¶ FIRST; *see also* Amended Joint Pretrial Order, Docket No. 12, at 1.

### B. Ability to Pay

In construing the "ability to pay" provision of 523(a)(15)(A), courts uniformly apply the "disposable income" test found in Section 1325(b)(2).[2] *In re Konick*, 236 B.R. at 529; *Dressler*, 194 B.R. at 304; *Bushee*, 211 B.R. 114–15. Regarding the debtor's current financial condition, "courts may consider the debtor's future earning capabilities and long-term financial prospects, particularly where the claim is to be paid incrementally over a period of time." *In re Konick*, 236 B.R. at 529.

Christina, presently employed as a waitress working only two nights per week, earns approximately $70 weekly. She states that she suffers from an anxi-

---

2. This section provides:

For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2).

ety/panic disorder, is under a doctor's care, and has been taking medications for the last three years. Because of this condition, she is unable to work more than two days per week.[3] In addition to her regular earnings the Plaintiff receives $175 per week from the Debtor, for a total weekly income of $245, or $1,053.50 monthly.[4]

On the expense side, Christina has monthly expenses totaling $2,023.75, leaving her with negative cash flow of $970 per month. With minor exceptions, it appears that the household expenses (i.e., mortgage, condo fee, gas and electric) are evenly divided with her live-in boyfriend, Dennis Counoyer, who is also a co-owner of the condominium in which they reside. The Debtor urges the court to consider in this mix the fact that Mr. Counoyer earns approximately $45,000 per year. We are unable to give this factor significant weight because nothing requires Mr. Counoyer to remain in this relationship. Also, there is no evidence of Mr. Counoyer's personal expenses. We find that by dividing the household expenses evenly, the Plaintiff has adequately accounted for Mr. Counoyer' presence.

In reviewing Christina's other financial circumstances, however, her explanation as to the disbursement of the proceeds from the sale of the former marital domicile is not adequate. Christina received $94,000 from the sale in 1996, and today states she has nothing left. She testified that: (1) $15,000 was used to pay off her car loan; (2) $5,000 was paid to credit card companies; (3) $5,000 was used to pay capital gain taxes; (4) $30,000 was the down payment on the new condominium; (5) $15,000 was used to purchase new furniture; and (6) $30,000 was paid to Mr. Counoyer to reimburse him "for all the money she borrowed from him over the prior three years." Mr. Counoyer initially testified that he received $10,000 from Christina,

then said later that he received no money from her. He stated that in lieu of money, he was not required to provide any of the down payment in exchange for his one-half interest in the condo. There is also a discrepancy with Christina's testimony and the answer she gave in her supplemental answers to interrogatories. In answer to Interrogatory Number 15 she states that she paid Mr. Counoyer in excess of $40,000. See Exhibit 10. Based on this evidence it is unclear as to what really happened with the $94,000, and we find that Christina has been less than forthcoming on this issue.

Regarding Walter, the evidence is as follows: Walter's successful dry cleaning business ended in 1996, when his contract with Stop and Shop was not renewed. The business failed and the company filed for Chapter 7 bankruptcy in August 1997. Three months later Walter was operating a new dry cleaning business called Hamlet Cleaners, Inc. Ostensibly, Hamlet is owned in equal shares by Walter's elderly mother, Helen Adler, and his wife, Cheri Nelligan. For her 50% ownership, Helen put approximately $50,000 into the business. Cheri contributed no capital to her shares. Walter maintains that he is merely an employee of Hamlet, earning $149 per week net as the "manager." For this salary Walter works 50–60 hours per week. This equates to an improbable wage rate of $2.00 per hour. Cheri is also employed by Hamlet and earns $370 net per week. For this salary, which is more than twice what Walter makes. Cheri "boxes some items at home" and generally helps out in the business approximately 30 hours per week. While performing services for the cleaners, Cheri also cares for their two children, ages twenty months, and three and one-half years.

On the expense side, Walter and Cheri claim combined monthly expenses totaling

---

**3.** While the Plaintiff did experience what appeared to be a "panic attack" during Debtor's counsel's final argument, that incident has not been treated as evidence and has been given no consideration for purposes of this decision.

**4.** 4.3 × 245= $1,053.50.

$3,079. *See* Exhibit 13. If the expenses are accepted as reasonable, Walter and Cheri have a monthly shortfall of $847.[5] Cheri testified that this shortfall is made up through "loans" from neighbors, family, and friends, and that the loans are usually in cash. Otherwise unexplained deposits into Walter and Cheri's checking account were also attributed to these "loans."

While Christina Adler's credibility leaves much to be desired, Cheri and Walter are even less believable. Walter runs Hamlet Cleaners and is the only person knowledgeable about the income and expenses of the business. He handles the daily deposits and is responsible for all cash coming into the business. Curiously at the end of each day Walter destroys the cash register receipts, the only objective evidence of what the business is actually doing. Without difficulty or hesitation, we find that Hamlet Cleaners is Walter's business, and that he is hiding income. Walter advertised his return to the dry cleaning business,[6] he is in charge of every aspect of the operation, and I doubt this transparent attempt to mislead the Court by manipulating the true ownership of the business and/or its actual income would be accepted by any reasonable trier of fact.

The Plaintiff's forensic accountant, Frank Mansella, casts suspicion over Walter's testimony regarding the income of Hamlet Cleaners. Mansella questioned Walter's record-keeping practices, especially why he would destroy cash register receipts at the close of each business day. He also compared the records of Walter's former dry cleaning businesses with those of Hamlet Cleaners' records, and discovered that in Walter's prior business his cost of supplies as a percent of sales was between 7.65% and 10.62%. The same analysis for Hamlet Cleaners produces a ratio of over 22%. This means that either the cost of Hamlet's supplies is double that of his

prior business, or that Walter is not reporting all the income from Hamlet Cleaners. We conclude that Hamlet's records are unreliable because Walter is not reporting honestly.

Similarly, we find that Cheri's testimony about loans from family and friends is not credible, and reject her explanation that the source of the unexplained deposits in their joint checking account are these "loans." More than likely, the deposits represent unreported cash from Hamlet Cleaners. Christina testified that while they were together she saw Walter take cash from the business, and that she often received alimony payments by cash. On this score, we find her credible.

■ Weighing the parties' financial conditions, their relative future earning potential, and their credibility, we find that the Plaintiff has met her burden to show that the Defendant has the ability to pay the debt in question. Although concerns remain as to what actually happened with the proceeds from the sale of the former marital domicile, Christina's financial future is not bright, considering her disability. Neither can we accord much weight to Mr. Counoyer's income, as he is not in a committed relationship with the Plaintiff.

On the other side of the equation we have Walter, who has run a very successful dry cleaning business in the past and clearly is very good at what he does. Hamlet Cleaners has lots of promise. That Walter has gone to such effort to conceal his true interest in the business, as well as the actual income generated by Hamlet Cleaners, only supports the conclusion that Walter's present worth and future earning potential are far greater than he admits.

### C. *Balancing Detriment vs. Benefit*

■ The final statutory requirement is to show that by discharging the obligation

---

**5.** $149 (Walter's [alleged] salary) + $370 (Cheri's salary of $519 per week net). 519 × 4.3 = $2,232 per month. $2,232 from $3,079 = $847.

**6.** *See* Exhibit B, Coupon.

the detrimental consequences to Christina are greater than the benefits resulting to Walter. Walter is working hard and is the de facto owner of a successful business that will grow over time, if history is any indication. Easily, we find that Christina has met her burden on this issue. While both parties show negative monthly cash flow and few assets, Walter's future earning potential is far brighter than Christina's. Neither Walter nor Cheri have been candid with the Court concerning their current financial circumstance, and their lack of credibility on most issues weighs against them in this balancing analysis, while Christina has little means to pay even basic living expenses. Clearly, the detriment to Christina by discharging this obligation outweighs any benefit to Walter.

For all of these reasons we find that Walter's obligation under the Property Settlement Agreement is determined to a nondischargeable under 11 U.S.C. § 523(a)(15).

Enter judgment consistent with this opinion.