In re Ronald L. BRASSLETT, Debtor.

Patricia Brasslett, Plaintiff,

v.

Ronald L. Brasslett, Defendant.

Bankruptcy No. 97–11951.
Adversary No. 98–1028.

United States Bankruptcy Court,
D. Maine.

March 18, 1999.

James C. Munch III, Vafiades, Brountas & Kominsky, Bangor, Maine, for plaintiff.

Perry H. O'Brian, Bangor, Maine, for defendant.

## Memorandum of Decision

JAMES B. HAINES, Jr., Chief Judge.

Before me is Patricia Brasslett's complaint to determine the dischargeability of divorce-related obligations (a property division award and an award of professional fees) owed her by Chapter 7 debtor Ronald Brasslett. Also pending is Ronald's § 522(f)(1) motion to avoid the judicial lien securing the property division debt.

After a consolidated trial and post-trial briefing, I conclude that the property division debt is excepted from discharge under § 523(a)(15) and that the professional fees award is nondischargeable pursuant to § 523(a)(5). I conclude that Patricia's judicial lien is unavoidable because the divorce judgment passed personal property to Ronald *subject to* a charge securing Patricia's right to payment of the property division award.[1]

### Background

1. *The Divorce Decree*

Until their 1995 divorce, Patricia and Ronald had been married for over thirty years. The state court awarded the marital home, the site of Ronald's then ongoing business, to Ronald with Patricia's acquiescence. The bulk of the couple's personal property was associated with Ronald's business and, so, was set aside to

him. Aiming for a fair split, the court concluded that under Maine's property division statute, *see* Me.Rev.Stat.Ann. tit. 19–A, § 953 (West 1998),[2] a "'just'" division was achieved by ordering Ronald to pay Patricia $90,000.00.[3]

Addressing the property division and Ronald's resulting obligation to Patricia, the decree provided:

[Ronald] shall satisfy this obligation within 120 days of the date this decree becomes final. Interest at the statutory post-judgment rate shall accrue as of that payment deadline but not before. [Patricia] shall have the right to file a lien against the real property and the personal property in order to secure her rights under this decree.

The decree also required Ronald to pay Patricia $1250.00 per month in alimony and to pay fees of several professionals she employed in the course of divorce proceedings. In arriving at its alimony award, the court found that at the time of the divorce Ronald had substantial capacity to earn income from his wood trucking and brokerage business. It found that he had reported annual income of $46,000.00 in 1992, $44,000.00 in 1993, but only $5000.00 in 1994 (an happenstance the court termed "aberrationally low"). It noted that Ronald under-reported his 1993 income and that, in reality, his net income for that year approximated $100,000.00. The judge opined that Ronald's reported income for other years might well have been less than

1. This memorandum sets forth my findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52 and Fed.R.Bankr.P. 7052. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Reform Act of 1978, *as amended,* ("Bankruptcy Code" or "Code"), 11 U.S.C. § 101 *et seq.*

2. The divorce decree entered under an earlier version of Maine's property division and alimony statutes. All citations and references in this memorandum are to the current statutes, which, for the purposes of my analysis, are substantively identical to their former incar-

nates. *See* Me.Rev.Stat.Ann. tit. 19, § 722–A (former property division statute); *id.* § 721 (former spousal support statute); *id.* § 722 (former payment of spousal support statute).

3. The court acknowledged that this was less than half of the net value of the assets. It arrived at this figure as Patricia's "equitable interest" in the estate because the court anticipated that the order would require Ronald to sell assets for less than fair market value and that his liability toward Patricia should "be in an amount that he can satisfy without destroying his ability to earn income."

what he actually realized from his business activities. In the divorce court's view, Patricia, who had been treated for anxiety and depression in the months preceding the divorce, had "no vocational skills."[4]

## 2. Post–Divorce Developments and Status in Quo

### a. Patricia's Circumstances

Patricia is now an unemployed, fifty-five year old single woman. Her health is only fair. She suffers from diabetes and chronic back pain. She cannot engage in taxing physical work, particularly work that requires bending, lifting, or standing for extended periods. During the last year, Patricia has had her gall bladder removed and has undergone hernia repair surgery. She considers herself "on the mend," and plans to commence searching for work in the near future.

Patricia has a high school education. She has never worked full-time, and was last employed as a housekeeper for a rural hospital, earning $5.68 per hour. She envisions the possibility of finding work that pays between $6.00 and $8.00 per hour, but doubts that she would be physically capable of working a forty-hour week.

Patricia subsists on the $400.00 per month alimony she receives from Ronald.[5] Patricia is without a home or apartment of her own. Her car, a 1987 Chevrolet Celebrity, does not run. An acquaintance, Glen MacDougal, provides Patricia a room in his home for $400.00 per month, including utilities. MacDougal loans her living expenses when she is short of funds (nearly every month). She pays him back when she can.

### b. Ronald's Circumstances

Ostensibly, Ronald no longer operates his own business, but is an employee of Irish Trucking (IT), a business owned, titularly, by his new wife, Marie Irish. Marie contributed the initial capital for the business and took out loans to purchase equipment. IT rose from the still-warm ashes of Ronald's former enterprise, Ron Brasslett Trucking (RBT), which ceased doing business prior to Ronald's bankruptcy. Ronald's business activities are basically unchanged, though smaller in scope, from what he did before he "went to work" for IT. He trucks pulpwood and brokers wood.

Ronald filed exhibits indicating he earns only $576.00 per month working for Marie, but he testified that since June 1998 he has been paid almost twice that for hauling wood. On top of that, he earns unquantified brokerage commissions, most of which are earned while he is at work for IT.[6] Ronald treats the commissions as his personal earnings, not as IT revenues.

Determining where Ronald Brasslett leaves off and IT begins is not an easy task. Although the truck he drives "for Irish" is not one of the old RBT rigs,[7]

---

4. With respect to the alimony award the court observed:

   [I]t is clear that alimony is warranted and that the Plaintiff has the ability to pay alimony. Further, this is not a case where alimony should be awarded for a limited period of time: the marriage will have been a long one, and the ages of the parties ( [Patricia] is 52) and the absence of any skilled employment history by [Patricia] support long-term alimony.
   [Ronald] shall pay to [Patricia] the monthly sum of $1,250.00. Payments shall continue until the death or remarriage of [Patricia].

5. The reduction in Ronald's monthly alimony obligation from $1,250.00 to $400.00 is discussed *infra*.

6. Brokering wood involves lining up and coordinating the activities of woodcutters and wood haulers, as well as negotiating contracts to supply the wood to mills. Much of the work is telephone work. Ronald brokers wood out of IT's office trailer and uses a cellular phone while he is, himself, hauling wood.

7. IT's truck was purchased by Marie, who provided the down payment and signed for the loan. One of Ronald's business associ-

Ronald uses most of his own tools in IT's business, and IT has access to much of the same equipment and the same office space as RBT formerly used.

The IT/Ronald Brasslett revenue picture is similarly hazy. Who (or what) generates funds and obtains their benefit is unclear. But it is clear that Ronald Brasslett maintains a reputation and relationships in the industry that would enable him to earn substantially more than he now earns. Ronald could make more money than he does either within IT by brokering wood and hauling it as an IT employee (with or without other *bona fide* IT employees) or outside of IT's operation using contract haulers. In the course of a February 1998 contempt hearing in the divorce court, Ronald testified that he could "market as much wood as [he] could take to the mill[s]." At trial in the bankruptcy court, John Prescott testified that Ronald has potential to develop more business than he now has and that he (Prescott) is ready and willing to co-broker wood with Ronald by providing financial backing.

#### c.   Obligations Reconfigured

After state court hearings in February 1998, at which Ronald was ordered to pay alimony arrearages exceeding $20,000.00, Patricia received $10,270.00 from him.[8] She used that money for living expenses and to pay MacDougal back what she then owed him. The February court order also reduced Ronald's ongoing alimony obligation from $1250.00 per month to $400.00 per month. The court determined that Patricia had earning capacity of $11,800.00 per year; that her living arrangement with MacDougal reduced her need for monthly alimony; and that Ronald's annual income had dropped to about $30,000.00. Ronald

has made no payments in respect to the $90,000.00 property settlement award.

### *Discussion*

My determinations under § 523 and § 522 are core proceedings under title 28 of the United States Code. *See* 28 U.S.C. §§ 157(b)(2)(B),(I). I enter final judgment.

#### A.   Dischargeability   of   the   $90,000.00 Property Settlement

##### 1.   Section 523(a)(15)

Dischargeability of the $90,000.00 property award is governed by § 523(a)(15). Subsection (a)(15) excepts from discharge a debt,

> that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—
>
> (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or
>
> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor[.]

§ 523(a)(15).

■ The § 523(a)(15) analysis addresses the parties' circumstances at the time of

---

ates, John Prescott, a successful wood broker, co-signed for the truck loan "to help out Ron."

8.   The divorce court's February 25, 1998, order required Ronald to pay approximately that sum to purge his contempt for failure to

pay alimony as required by two previous court orders. In Patricia's words, he paid her "just enough to keep out of jail." Her characterization appears entirely accurate. Since the February order, Ronald has paid monthly alimony irregularly, but has made no further payments to reduce the arrearage.

trial, rather than at the time of the divorce judgment. *See Marquis v. Marquis (In re Marquis)*, 203 B.R. 844, 851 (Bankr.D.Me. 1997); *Dressler v. Dressler (In re Dressler)*, 194 B.R. 290, 300–01 (Bankr.D.R.I. 1996).

■ Given that the obligation at issue is within § 523(a)(15)'s general scope, two elements are critical. The debt will be excepted from discharge, first, only if Ronald can pay the debt and, second, if the detriment to Patricia resulting from the discharge outweighs the benefit Ronald would obtain by discharging it. *See In re Marquis*, 203 B.R. at 850 & n. 11; *Kessler v. Butler (In re Butler)*, 186 B.R. 371, 373 (Bankr.D.Vt.1995).[9]

■ The burden of proof falls on Patricia as plaintiff with respect to each element. *See In re Marquis*, 203 B.R. at 852; *Adie v. Adie (In re Adie)*, 197 B.R. 8, 9 n. 1 (Bankr.D.N.H.1996); *In re Dressler*, 194 B.R. at 303–04; *In re Butler*, 186 B.R. at 373–75.[10]

■ For Patricia to succeed she must prove her case by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("[W]e hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."); *accord In re Dressler*, 194 B.R. at 302 & n. 28.

### 2. Subsection 523(a)(15)(A)
#### a. Ability to Pay Test

■ To assess Ronald's § 523(a)(15)(A) payment ability, I draw upon the "ability to pay" framework and disposable income test utilized in analyzing Chapter 13 plan confirmation disputes under § 1325(b). *See In re Dressler*, 194 B.R. at 304 (collecting cases employing the disposable income test in applying § 523(a)(15)(A), noting that some courts have used a § 523(a)(8) student loan dischargeability "undue hardship" test instead); *accord In re Marquis*, 203 B.R. at

---

**9.** In *In re Butler*, Judge Conrad unraveled § 523(a)(15)'s triple negatives:

> For comprehension purposes only, the section can be read to make property settlements nondischargeable IF a debtor is able to pay those debts or IF a discharge would be too detrimental to the ex-spouse. Congress has decided that if a debtor is able to pay the debt owed to the ex-spouse without harming him or herself more than nonpayment would harm the ex-spouse, the debtor should uphold his or her separation obligation.

*In re Butler*, 186 B.R. at 373.

**10.** Courts disagree whether the plaintiff or defendant bears the burden of proof in § 523(a)(15) complaints. *Compare e.g., Frey v. Frey (In re Frey)*, 212 B.R. 728, 737 (Bankr. N.D.N.Y.1996) (analyzing disagreement over burden of proof, concluding that the burden rests with the plaintiff in proving the entire § 523(a)(15) case), *and In re Dressler*, 194 B.R. at 303–04 ("The statute and the rules do not require ... procedural gymnastics.... I conclude that the § 523(a)(15) plaintiff bears the burden of production and proof on all elements of dischargeability."), *with In re Crosswhite*, 148 F.3d 879, 884 (7th Cir.1998) ("[O]nce the creditor's initial proof is made, the debt is excepted from discharge and the debtor is responsible for the debt *unless* either of the two exceptions, subpart (A), the 'ability to pay' test, or (B), the 'detriment' test, can be proven by the debtor."), *and Hart v. Molino (In re Molino)*, 225 B.R. 904, 907 (6th Cir. BAP 1998) ("The objecting creditor bears the burden of proof to establish that the debt is of a type excepted from discharge under § 523(a)(15). Once the creditor has met this burden, the burden shifts to the debtor to prove either of the exceptions to nondischargeability contained in subsections (A) or (B)."). *See also generally In re Marquis*, 203 B.R. at 852 nn. 14, 15 (observing the "considerable confusion in the courts" regarding the burden of proof); *In re Dressler*, 194 B.R. at 301–03 (discussing disagreement); *Stone v. Stone (In re Stone)*, 199 B.R. 753, 759–82 (Bankr.N.D.Ala.1996)(observing disagreement, thorough discussion, collecting cases). While this is only the third time I have visited the issue in writing, *see In re Marquis*, 203 B.R. at 852 nn. 14, 15; *In re Dressler*, 194 B.R. at 301–03, many plaintiffs have pleaded and proved § 523(a)(15) claims before me. I adhere to a straightforward allocation of the burden of proof because it is consistent with the statute and the rules and because it works fairly in practice.

851. Applying the "disposable income" test, I consider what Ronald has available to pay the $90,000.00 obligation after deducting his " 'reasonably necessary' expenses." *In re Dressler*, 194 B.R. at 304 (quoting § 1325(b)(2)). *Accord In re Marquis*, 203 B.R. at 851 (quoting *In re Dressler*). I consider not only what Ronald presently has on hand to satisfy the debt, but also whether he "could make reasonable payments on the debt from his disposable income." *Gamble v. Gamble (In re Gamble)*, 143 F.3d 223, 226 (5th Cir.1998).

### b. Ronald's Ability to Pay

As with most debtor/defendants, Ronald "pleads poverty." *In re Dressler*, 194 B.R. at 304. At trial Ronald attempted to show that his current circumstances are tenuous, that he works for IT as a modestly recompensed employee, and that the prospects for increasing his income, including brokerage commissions, are iffy. Though Marie provided start-up funds for IT and is IT's titular owner, Ronald is IT's driving force: his expertise and engagement sustain IT.

Ronald would have me believe that he works for Marie and that she runs the company. Marie conceded she knows next to nothing about the wood hauling and brokering business; that what she knows she learned from Ronald; and that she has been, at best, a "slow learner."

In other words, Ronald drives IT, although from the back seat. Marie is only along for the ride.[11] Ronald's characterization of his financial circumstances is but an attempt to "artificially diminish[ ] his ability to repay obligations addressable under § 523(a)(15)." *In re Molino*, 225 B.R.

at 908 (concluding that the debtor's conduct in attempting to camouflage his ability to pay could be considered as part of the § 523(a)(15) analysis).[12] He has done all he could to avoid paying Patricia's $90,000.00 property division award by minimizing (or camouflaging) his income and by conducting his business in Marie's name. I have no doubt that, if Patricia's claims are discharged, Ronald will be out making more money in a wink.

■ There is ample evidence that Ronald's current circumstance and future prospects provide him with the ability to pay. He has good relationships within the wood brokering community. He possesses opportunities to obtain the financial backing to increase IT's hauling contracts and to generate additional brokerage commissions. *See In re Molino*, 225 B.R. at 908 ("[A] court may look to a debtor's prior employment, future employment opportunities, and health status to determine the future earning potential of the Debtor."). Ronald may only have one bird in hand but he has many more in the bush, and under § 523(a)(15)(A) the birds in the bush are not to be ignored.

Although obfuscation and the unreliability of Ronald's budget figures preclude putting too fine a point on my analysis, I note that his budget includes substantial payments for "credit cards" (either prepetition or Marie's) ($100.00 per month), a "camper" payment ($138.00 per month), an allocation for "camper insurance," and food ($500.00 per month). He has room to tighten his financial belt a few notches so that he may commence meaningful payments on the $90,000.00 property division debt.[13]

---

**11.** Marie testified that she had recently cut back her work for the company due to poor health, and that she generally deferred to Ronald with respect to operations.

**12.** I also note that Ronald compromised a potential preference dispute with the Chapter 7 trustee, paying $5000.00 to the trustee in exchange for the trustee's forbearance from pursuing $5,008.15 in transfers made to three

family members on the eve of his bankruptcy. Similarly, the February 1998 state court order observed that Ronald had made "past decisions to pay other family members instead of a judgment creditor who happens to be his former wife."

**13.** Marie's contribution to the household is a net positive, when her employment income and interest in IT are taken into account,

## 3. Subsection 523(a)(15)(B)

### a. Balancing Benefit and Detriment

Having determined that Ronald has the ability to pay the obligation, I must inquire whether, if the obligation at issue is discharged, Patricia's detriment would exceed Ronald's benefit. *See In re Dressler*, 194 B.R. at 300.[14] This is, at best, a nettlesome exercise.[15]

### b. Patricia's Detriment exceeds Ronald's Benefit

#### i. Patricia's Detriment

Unlike the plaintiff in *In re Marquis*, Patricia has provided particulars vis-a-vis the detriment she anticipates if the obligation is discharged. *See In re Marquis*, 203 B.R. at 853 n. 17. She has "demonstrat[ed] that discharging the obligation[ ] at issue... will trigger consequences that affect her materially and adversely." *Id.* at 853.

Discharging Ronald's property division debt will leave Patricia with only alimony to fund her modest lifestyle. It will deprive her of potential funds for living, rather than expose her to third-party collection efforts. *Cf. Turner v. McClain (In re McClain)*, 227 B.R. 881 (Bankr.S.D.Ind. 1998); *Lengyel v. Lengyel (In re Lengyel)*,

212 B.R. 840 (Bankr.S.D.Tex.1997); *In re Dressler*, 194 B.R. 290.

As it stands, Patricia has insufficient funds to support herself month to month. Although she is admirably confident about her ability to find work, she has no present prospects and, long-term, the prospects that she will find meaningfully remunerative employment are unpromising. If she does find work, she has no means of transportation to and from her job. As it is, Patricia must depend on MacDougal's largesse just to keep a roof over her head.

Discharging the $90,000.00 obligation will deprive Patricia of funds she needs to live decently and independently. It would stifle such prospects as she may have to better her circumstances. Patricia does not have "the personal resources to survive the consequences of the discharge." *In re Dressler*, 194 B.R. at 305.[16] Hers is something more than an unpalatable, but tolerable loss. She has distinguished her plight from the plight of most chagrined, unsecured creditors of Chapter 7 debtors. *See In re Marquis*, 203 B.R. at 851 & n. 13; *see also In re Dressler*, 194 D.R. at 305–306.

#### ii. Ronald's Benefit

On the other side of the § 523(a)(15)(B) scale, I have already con-

---

which they properly may be under § 523(a)(15). *See In re Gamble*, 143 F.3d at 226 (new spouse's contribution to household income appropriately considered under § 523(a)(15)).

**14.** The § 523(a)(15)(B) equation is sometimes expressed as requiring a showing that the discharge would not result in a benefit to debtor that outweighs the detriment to the non-debtor spouse. *See, e.g., In re Adie*, 197 B.R. at 9; *In re Dressler*, 194 B.R. at 305. There is no substantive difference between the two expressions of the § 523(a)(15)(B) standard. They are two sides of the same coin.

**15.** Applying other provisions of the Code sometimes requires me to assess the debtor's financial circumstances. *See, e.g.,* § 523(a)(8), § 1325(b), § 707(b). No other section calls for a thoroughgoing analysis of a creditor's financial circumstances, much less a weighing of them against the debtor's.

**16.** At trial Ronald attempted to show that Patricia's relationship with her landlord and friend, Glen MacDougal, goes beyond a shelter-in-the-storm association. Courts have pondered what weight should be given to the contribution of live-ins or spousal equivalents. *See, e.g., In re Crosswhite*, 148 F.3d at 888–89 & n. 17 (remanding case to the bankruptcy court, assigning the "task of determining whether there has been a sufficient degree of economic interdependence to have altered [the party's] economic situation."). In today's § 523(a)(15) analysis, I put little weight on the alleged contributions of Patricia's benefactor in assuaging the detriments she will suffer if the obligation at issue is discharged. Ronald produced no hard evidence whether, and for what length of time, Patricia "lived as a single economic unit and the degree to which they have commingled their assets." *Id.* at 889 n. 17.

cluded that Ronald has the ability to pay this obligation going forward. While Ronald would obviously benefit from discharging a $90,000.00 obligation, the opportunity to increase his discretionary disposable income is not the kind of benefit that carries much weight. *See In re Taylor,* 191 B.R. 760, 766 (Bankr.N.D.Ill.1996); *Florio v. Florio (In re Florio),* 187 B.R. 654, 658 (Bankr.W.D.Mo.1995); *Carroll v. Carroll (In re Carroll),* 187 B.R. 197, 201 (Bankr. S.D.Ohio 1995).

### *iii. The Imbalance*

■ Patricia is dependent on modest alimony, on attaining low-wage work within her physical limitations, and on MacDougal's charity which, whatever the character of their relationship, is entirely voluntary. Her circumstances will devolve further, perhaps precipitously, if the obligation is discharged. Ronald is able to pay the obligation. Discharge of a $90,000.00 obligation is obviously desirable in his eyes, but he can pay it, over time, without financial hardship.

The scales are not near balance. Drawing on the articulation of § 523(a)(15)'s calculus set forth in the legislative history, the "benefits" of Ronald's discharge are appropriately "sacrificed" because the "substantial detriment" to Patricia "outweighs" Ronald's "need for a fresh start." H.R.Rep. No. 835, § 304 (1994) *reprinted in* 1994 U.S.C.C.A.N. 3363.

### *4. Two Thorny § 523(a)(15) Considerations*

#### *a. Whether a Partial Discharge is Permissible Under § 523(a)(15)*

The parties have the question whether I could make a 523(a)(15) determination providing for partial discharge of the $90,000.00 property settlement obligation.

A handful of courts have held that § 523(a)(15) is not an all-or-nothing propo-

sition; a court can determine that only part of the debt is discharged. *See Newcomb v. Miley (In re Miley),* 228 B.R. 651, 656 (Bankr.N.D.Ohio 1998) *Perkins v. Perkins (In re Perkins),* 221 B.R. 186, 190 (Bankr.N.D.Ohio 1998); *In re Smither,* 194 B.R. 102, 109–10 (Bankr.W.D.Ky. 1996); *McGinnis v. McGinnis (In re McGinnis),* 194 B.R. 917, 920 (Bankr. N.D.Ala.1996); *Comisky v. Comisky (In re Comisky),* 183 B.R. 883, 884 (Bankr. N.D.Cal.1995). Others disagree. *See Smith v. Smith (In re Smith),* 218 B.R. 254, 260 (Bankr.S.D.Ga.1997) *Taylor v. Taylor (In re Taylor),* 191 B.R. 760, 766 (Bankr.N.D.Ill.1996); *Silvers v. Silvers (In re Silvers),* 187 B.R. 648, 649 (Bankr. W.D.Mo.1995); *Hill v. Hill (In re Hill),* 184 B.R. 750, 755 n. 15 (Bankr.N.D.Ill. 1995). *See generally,* Elisa A. Smith, Comment, *Partial Dischargeability of Property [sic] in a Divorce Settlement: A Call for an Equitable Remedy Under Section 523(a)(15) of the Bankruptcy Code,* 15 Bankr.Devs.J. 87 (1998).

I need not resolve the issue today. Having concluded that Ronald has the ability to pay the entire debt, I decline to engage in a protracted, sliding-scale evaluation of the marginal shifts in benefit/detriment analysis that would accompany each additional dollar of discharge that might be had under the "partial dischargeability" approach.

#### *b. The Potential Modification Alimony and its Impact On the § 523(a)(15) Determination*

Given Ronald's ongoing obligation to pay Patricia alimony,[17] and given the potential that his alimony might be adjusted in light of his bankruptcy discharge, *see In re Smith,* 218 B.R. at 260 ("Clearly, a discharge of a debtor's debts, including divorce obligations, changes the financial status of the non-debtor ex-spouse and, therefore, may be relied upon in a state

---

**17.** The parties agree that Ronald's accrued and ongoing alimony obligations escape dis-

charge under § 523(a)(5).

court proceeding to modify a divorce decree of alimony, support, or maintenance without violating the discharge injunction of 11 U.S.C. § 524."),[18] the question arises whether the potential for an alimony modification mitigates the detriment Patricia might experience if the property settlement obligation is discharged. If that were the case, any § 523(a)(15) plaintiff entitled to ongoing alimony could be frustrated in establishing a critical element of his or her claim.

Addressing a contest over a $4000.00 promissory note obligation *cum* property settlement *cum* contested § 523(a)(15) obligation, the late Judge Yacos concluded that the plaintiff could not establish a discharge detriment that outweighed the debtor's discharge benefit,

> not because the plaintiff doesn't have some good arguments about readjusting support and alimony, in view of the bankruptcy and the discharging of the $4000 debt, but because this Court cannot really determine ability to repay or detrimental consequences in this case because this Court does not have the power that the state court has to readjust support and/or impose new alimony obligation to take into account the changed circumstances resulting from the wiping out of the $4000 property settlement obligation in bankruptcy as well as the discharge of the debtor's other debts.

*In re Adie,* 197 B.R. at 9–10. Ronald urges me to adopt the *In re Adie* view. Patricia argues that *In re Adie* is distinguishable and that, in any event, I should make my dischargeability determination based on the facts in front of me, without regard for the possibility that the state court might modify her alimony award (up-

ward) if I order the discharge of the $90,-000.00.

I decline to follow *In re Adie* here. There is an analytical refraction created by the bankruptcy court's duty to determine a § 523(a)(15) dispute and the state court's power to modify an alimony award based on *any material change of circumstances,* including discharge of a property settlement debt. However, using Judge Yaco's articulation in *In re Adie,* my role is to "take[ ] a 'snap shot' " of Patricia and Ronald's circumstances (and prospects) as they appear at trial, irrespective of my awareness that "the state court has a camera that takes 'moving pictures.' " 197 B.R. at 10 n. 2.

An untold variety of events—unrelated to action by a divorce court—might occur the day, week, month, or year after this § 523(a)(15) snap-shot that alter the debtor's ability to pay or the balance of detriment and benefit. I cannot account for them. What is more, the dischargeability determination becomes a constant. The state court may take it as one "given" as other circumstances change. It can modify modifiable obligations (or not) in light of it.

Finally, I am loathe to "pass the buck" to the state court when doing so will require Patricia to initiate yet another court proceeding and to attempt to unravel and prove (yet one more time) Ronald's financial wherewithal. Having been from pillar to post, I decline to direct her back again.[19]

### B. Dischargeability of the Attorney Fees Award

#### 1. The Attorney Fees

The judgment ordered Ronald to pay the $2500 in fees to Patricia's divorce at-

---

**18.** Other courts echo what the *In re Smith* court stated in one breath. *See, e.g., Siragusa v. Siragusa (In re Siragusa),* 27 F.3d 406, 408 (9th Cir.1994) (modification of alimony not a violation of the § 524 injunction); *In re Trickey,* 589 N.W.2d 753 (1998) (holding that the consequences of bankruptcy may warrant the modification of alimony under state law).

**19.** The *In re Adie* parties were in the midst of state court proceedings to determine or adjust the debtor's support obligation. The bankruptcy court expressed confidence that the state court would "react appropriately" to the change in circumstance brought about by the debtor's bankruptcy. *Id.* at 10. Ronald and Patricia are not currently involved in state court litigation over their divorce.

torneys. The court stated that the award was,

> [b]ased on the parties['] respective abilities to pay the expenses of litigation and based on the intransigence of [Ronald] in providing discovery [to Patricia] (requiring several court appearances by counsel), [Ronald] shall pay to John H. Richards, Jr., Esq.[,] the sum of $1,500 and to Marvin H. Glazier, Esq.[,] the sum of $1,000, execution to issue.
>
> [Ronald] shall also be responsible for the fee of Dewey W. Martin, amounting to $935, as this professional service was needed to explore and explain the circumstances of [Ronald's] income.[20]

This passage followed on the heels of the court's establishment of Ronald's monthly alimony liability. *See supra* note 4.

### 2. Section 523(a)(5)

The resolution of the parties' dispute over the dischargeability of the $2500.00 attorney fees award falls under the purview of § 523(a)(5). As pertinent, this section provides that any debt:

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
>
> . . . .

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[,]

is nondischargeable. § 523(a)(5).

■■■■■ I must look at the "circumstances that existed at the time that the [attorney fees] obligation was created to ascertain whether it then functioned to provide support" to Patricia. *In re Dressler*, 194 B.R. at 295 (collecting cases). "[T]he question whether a fee award was intended to serve as alimony, maintenance or support is a ... factual question." *In re Marquis*, 203 B.R. at 848. *See also Holliday v. Kline (In re Kline)*, 65 F.3d 749, 750 (8th Cir.1995) (reviewing a determination that attorney fees function as support for clear error because it is a question of fact).[21] The § 523(a)(5) inquiry does not stop at the labels applied in the decree; its substance prevails over its form. *See In re Dressler*, 194 B.R. at 295. Proper characterization of the obligation under § 523(a)(5) is a matter of federal law, but the substantive state law enlightens my analysis. *See In re Frey*, 212 B.R. at 733; *In re Dressler*, 194 B.R. at 295 & n. 19; *In re Macy*, 192 B.R. at 805.

### 3. Applying § 523(a)(5)

■■■ The fee awards in the Brasslett decree, including the award to Dewey Martin, were in the nature of alimony. The court's language, "[b]ased on the parties['] respective abilities to pay the expenses of litigation," discloses its intention

---

**20.** The judgment provided that to the extent Patricia paid the professionals she was entitled to reimbursement from Ronald.

**21.** It is generally agreed that the direction of the state court to pay the attorney fees to the attorneys and not to Patricia directly does not bar the conclusion that they fall within the embrace of § 523(a)(5). *See e.g., In re Kline*, 65 F.3d at 751; *In re Marquis*, 203 B.R. at 848; *Macy v. Macy (In re Macy)*, 192 B.R. 802, 806 (Bankr.D.Mass.1996) *affirmed Macy v. Macy*, 114 F.3d 1 (1st Cir.1997) ("We find that the reasoning of the decisions below is sound, and affirm for substantially the rea-

sons put forth therein."); *Heintz v. Tremblay (In re Tremblay)*, 162 B.R. 60, 62 (Bankr. D.Me.1993); *see also In re Macy*, 114 F.3d at 3 (holding that the enactment of § 523(a)(15) did not "affect the liberal interpretation of section 523(a)(5)" that includes attorney fees incurred collecting alimony, maintenance, or child support). In any event, the judgment's provision for Ronald to reimburse Patricia for any payments she might make to the enumerated professionals establishes an obligation owing directly to her. *See In re Dressler*, 194 B.R. at 297–98.

that the award serve as a supplemental form of financial aid (*i.e.*, alimony) for Patricia. As to the Martin award, which was distinctly articulated, the court considered Ronald's obstructive litigation tactics as unfairly necessitating that Patricia incur the fees *in light of the parties' respective financial circumstances.* Ronald was ordered to pay the fees to alleviate the financial oppression his tactics occasioned. *See In re Kline*, 65 F.3d at 750–51 (upholding the bankruptcy court's determination "that the intended function of the award of attorney fees was to equalize the disparity of income between [the parties], thereby enabling [the plaintiff] to support herself" and therefore "was in the nature of maintenance" under § 523(a)(5)).[22]

## C. *Avoidability of the Lien*

■■■ Ronald bears the burden of proving all the elements required for avoiding Patricia's lien pursuant to § 522(f)(1). *See In re Bozzelli*, 227 B.R. 770, 772 (Bankr.

E.D.Pa.1998); *In re Maylin*, 155 B.R. 605, 614 (Bankr.D.Me.1993).[23]

### 1. *The Judicial Lien*

In making provision for Ronald's payment of the property settlement to Patricia, the divorce court decreed that Patricia "shall have the right to file a lien against the real property and the personal property in order to secure her rights under this decree." [24] Just shy of fourteen months later Patricia attained a $100,912.05 writ of execution from the district court. Patricia's UCC–1 was filed on April 12, 1997, encumbering "[a]ll equipment or vehicles owned by Ronald L. Brasslett," pursuant to the "Judgment dated January 26, 1995."[25]

### 2. *Ronald's Exemption Claim*

Pursuant to Maine exemption statute, *see* Me.Rev.Stat.Ann., tit. 14, § 4422 (West Supp.1998), Ronald has claimed a $10,-750.00 exemption in "tools of trade."[26]

---

**22.** My determination is buttressed by state substantive law. Title 19–A, section 952 of Maine Revised Statutes Annotated governs the state court's treatment of the payment of spousal and child support and payment of related fees. It provides, in part: "When making a final decree, the court may order a party to pay reasonable attorney's fees. Attorney's fees *awarded in the nature of support* may be made payable immediately or in installments." Me.Rev.Stat.Ann. tit. 19–A, § 952(3) (West 1998) (emphasis added). In awarding the fees, the Brasslett court looked at the economic disparity between the parties and Ronald's evasive conduct played in amassing the fees. The Maine Supreme Court has held that these are appropriate inquiries under § 952 when courts award fee as part of an alimony award. *See Rosen v. Rosen*, 651 A.2d 335, 336–37 (Me.1994); *Harding v. Murray*, 623 A.2d 172, 177 (Me.1993); *True v. True*, 615 A.2d 252, 253 (Me.1992).

**23.** Since Patricia has not challenged Ronald's entitlement to the exemption as part of her § 522(f) defense, this is not a situation in which the burden shifts to Patricia. *See Id.* at 614.

**24.** While the decree provided for the recording of the divorce decree vis-a-vis the real property in accordance with the provisions of

the statute, *see* Me.Rev.Stat.Ann. tit. 19–A § 953(5)–(7), neither the statute nor the decree make any further provision for the perfection of the lien on personal property.

**25.** Maine law provides that judicial liens may be perfected against personal property by filing a UCC–1 with the Secretary of State. *See* Me.Rev.Stat.Ann. tit 14, § 4151 (West Supp. 1998) (property subject to attachment); Me. Rev.Stat.Ann. tit. 11, § 9–401 (West 1995) (place of filing).

**26.** Ronald's original schedule C claimed a $2000.00 tools of the trade exemption under an unspecified subsection of § 4422. He amended the schedule to assert two tools of the trade exemption claims, one of $5000.00 and one of $5750.00, again without attribution to any subsection of the exemption statute. In his motion to avoid liens and his post-trial brief, Ronald clarifies that the claims were made under subsection (5) and (16) respectively. *See id.* § 4422(5) (allowing an exemption not to exceed $5000.00 in tools of the trade); *id.* § 4422(16) (allowing a claim vis-a-vis subsection (5) tools of the trade equal to unused amounts of the residence exemption not to exceed $6000.00).

The list of exempt tools is lengthy. It includes office equipment, hand tools, and me-

### 3. Section 522(f)(1)

■ Section 522(f)(1) of the Bankruptcy Code permits Ronald to "avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled." § 522(f)(1). A § 522(f)(1) dispute can raise a multitude of issues, including the debtor's entitlement to the exemption, *see, e.g., In re Patterson*, 825 F.2d 1140 (7th Cir.1987); the extent of the debtor's equity in the property, *see, e.g., Menell v. First Nat'l Bank of Boston (In re Menell)*, 37 F.3d 113 (3d Cir.1994), the nature and validity of the lien, *see, e.g., Graffen v. City of Philadelphia*, 984 F.2d 91 (3d Cir.1992), and the extent of impairment and avoidability. *See East Cambridge Sav. Bank v. Silveira (In re Silveira)*, 141 F.3d 34 (1st Cir.1998). *See generally e.g., In re Ray*, 104 B.R. 217, 220 (Bankr.W.D.Mo.1989) (stating basic three questions in a § 522(f)(1) inquiry). This case raises but one: Did the assets pass from the marital property to Ronald's individual property *subject to* a lien securing Patricia's right to a $90,000.00 payment, or did she acquire a lien on those assets *after* they became Ronald's individual property? [27]

*Farrey v. Sanderfoot*, 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991) is germane to this § 522(f)(1) analysis. *Farrey* examined § 522(f) lien avoidance when a divorce decree simultaneously created the debtor/defendant's property interest and the plaintiff's lien.[28] The Court held "that § 522(f)(1) of the Bankruptcy Code requires a debtor to have possessed an interest to which a lien attached, before it attached, to avoid the fixing of the lien on that interest." *Id.* at 301, 111 S.Ct. 1825. Looking at the terms of the state court's property division, the Court concluded that the debtor/defendant "never possessed his new fee simple interest before the lien 'fixed,'" and, thus, § 522(f)(1) was "not available to void the lien." *Id.* at 300, 111 S.Ct. 1825.

### 4. Applying § 522(f)(1) and Farrey

Pursuant to *Farrey*, I have no difficulty concluding that if the Brasslett decree, within its four corners, effected a "charge against or interest in" Ronald's tools of the trade "to secure payment" of the property settlement, *see* § 101(37) (defining "lien" for the purposes of the Code), then it is a judicial lien, *see* 101(36) (defining judicial lien), that Ronald may not avoid.

On the other hand, if the creation of Patricia's "charge against or interest in" the property was contingent on her "filing a lien against the real property and the personal property," the lien would be avoidable because it attached to the property long after it had been set aside to

---

chanic's machinery. Values range from a ten dollar desk to a $3500 "R MODEL WITH LOADER."

**27.** Maine's division of property statute requires the court to "set apart to each spouse the spouse's property and [to] divide the marital property in proportions the court considers just." Me.Rev.Stat.Ann. tit. 19–A, § 953(1). There is a rebuttable presumption that property acquired subsequent to the marriage is marital property. *See id* (3). *See In re Haynes*, 157 B.R. 646, 649–50 (Bankr. S.D.Ind.1992) (concluding that a state property division law that creates a "marital pot" prior to division means that "the Debtor's pre-marriage interest in the property could not pass through the marriage and divorce unaffected").

The Brasslett divorce decree identified Ronald's tools and business equipment as marital property, set it aside to Ronald individually, and awarded Patricia $90,000.00 in consequence of its action.

**28.** In *Farrey* the property interest involved and the exemption claimed was the homestead. It hardly needs stating that the establishment and perfection of a lien in real property can differ from creation and perfection of a lien in personal property. Likewise, homestead exemptions and tools of the trade exemptions present differences that could be significant in other circumstances. The current dispute does not require a parsing of these distinctions. *Farrey*'s application to the dispute before me is (relatively) straightforward.

Ronald individually.[29]

 I am able to divine the divorce decree's operation in this regard only with difficulty. Its terms are not express. Its provisions concerning Patricia's "right to file a lien against the real property and the personal property in order to secure her rights under this decree," could be construed as no more than an annunciation of a collection method and/or advice on how she could protect her interest against third parties. Alternatively, the order could be viewed as outlining steps that Patricia must take as a *prerequisite* to establishing a "charge against or interest in" Ronald's tools of the trade.[30] I conclude that the decree had the former effect. This is why:

The court plainly contemplated that a lien would secure Patricia's right to payment and that the lien was to attach to the real and personal property that the divorce court set aside to Ronald. Given that a substantial portion of those assets (including the tools of trade) are "exempt from attachment and execution" under state law, *see* Me.Rev.Stat.Ann. tit, 14, § 4422, the lien provided for by the divorce court could not have been *created* by post-judgment execution processes. From that fact, it follows that the divorce decree itself fixed Patricia's lien on the marital property no later than contemporaneously with its transformation to Ronald's individual property. Patricia's "right to file a lien" as provided for by the divorce court could only have been intended to authorize her to go forward with the steps necessary to perfect her lien rights against third parties.

Thus, Ronald never possessed his "new," individual interest in the tools of trade at any time before Patricia's lien affixed. Her lien cannot be avoided.

### Conclusion

For the reasons set forth above, it will be ordered that: Ronald's $90,000.00 property division obligation to Patricia is excepted from discharge under § 523(a)(15); Ronald's obligation to pay Patricia's professional fees as set forth in the divorce decree is excepted from discharge under § 523(a)(5); and Ronald's lien avoidance motion is denied.

A separate order consistent with this opinion will issue forthwith.

---

29. Though Patricia obtained a writ of attachment and filed a UCC–1 in the aftermath of the divorce, if those steps were a prerequisite to the lien's creation, the lien's "fixing" took place well after Ronald's interest arose. Ronald would succeed in avoiding the lien because he "possessed an interest to which a lien attached, before it attached." *Farrey,* 500 U.S. at 301, 111 S.Ct. 1825.

30. I note that magic words are not required for a state court dividing property to create a judicial lien. The calculus is simple. Judicial liens in personal property can arise "solely as the result" of the entry of judgment. *In re Ray,* 104 B.R. at 221.